ORAL ARGUMENT SCHEDULED FOR JANUARY 23, 2012

No. 11-5135

_____
_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

NATIONAL FEDERATION OF FEDERAL EMPLOYEES – IAM,

Plaintiff-Appellant,

v.

THOMAS J. VILSACK, SECRETARY,
UNITED STATES DEPARTMENT OF AGRICULTURE, et al.,

Defendants-Appellees

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

BRIEF FOR THE APPELLANT

_____

STEFAN P. SUTICH
General Counsel
National Federation of Federal
Employees, FD1, IAMAW
805 15th Street NW Ste. 500
Washington, D.C. 20005
(202) 216 – 4457

## <u>CERTIFICATE AS TO PARTIES,<br>RULINGS, AND RELATED CASES</u>

Pursuant to Circuit Rule 28(a)(1), Counsel for the National Federation of Federal Employees certifies as follows:

### A.   <u>Parties and Amici</u>:

The National Federation of Federal Employees, FD-1, affiliated with the International Association of Machinists and Aerospace Workers (IAM), AFL-CIO ("NFFE") is the Appellant. NFFE was the Plaintiff in the District Court.

 Thomas J. Vilsack, Secretary of Agriculture, and Thomas L. Tidwell, Chief of the United States Forest Service, in their official capacities, are the Appellees. They were the Defendants in the District Court.

No intervenors or amici appeared in the lower court proceedings.

### B.   <u>Rulings Under Review</u>:

NFFE seeks review of the April 6, 2011 Memorandum Opinion and Order of the Honorable Beryl A. Howell of the U.S. District Court for the District of Columbia granting summary judgment to the Defendants in <u>National Federation of Federal Employees-IAM v. Vilsack</u>, 775 F. Supp. 2d 91 (D.D.C. 2011). The parties have agreed to a deferred appendix. <u>See</u> Circuit Rule 30(c).

**C.**    **<u>Related Cases</u>:**

This case has not previously been before this Court and there are no currently pending related cases.

## **CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1(c), National Federation of Federal Employees, Federal District-1, IAMAW (captioned National Federation of Federal Employees-IAM), an unincorporated labor organization affiliated with the International Association of Machinists and Aerospace Workers, AFL-CIO, certifies that it has no parent companies and that no publicly held corporation owns 10 percent or more of NFFE.

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . .   iii

GLOSSARY . . . . . . . . . . . . . . . . . . . . . . . . .   vi

STATEMENT OF JURISDICTION . . . . . . . . . . . . . .   1

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . .   2

STATUTES AND REGULATIONS . . . . . . . . . . . . . .   3

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . .   3

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . .   18

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . .   21

    I.    SUMMARY JUDGMENT AND FOURTH
          AMENDMENT STANDARDS OF REVIEW . . . . . .   21

         A.    The Circuit Court of Appeals reviews a grant of
             summary judgment *de novo* and must construe
             the facts in the light most favorable to Appellant. .   21

         B.    The Fourth Amendment prohibits random
             suspicionless drug testing unless a legitimate
             governmental interest outweighs the employee's
             constitutional privacy interest. . . . . . . . .   23

    II.    THE DISTRICT COURT MISAPPLIED THE CASE LAW
          AND INCORRECTLY LOWERED THE DEFENDANT'S
          BURDEN TO DEMONSTRATE A LEGITIMATE
          GOVERNMENTAL INTEREST. . . . . . . . . . .   25

         A.    The USDA Drug Testing Regulation is overbroad
             and NFFE's action focused on the individualized
             job requirements and responsibilities of different
             JCCCC employee positions. . . . . . . . . .   25

B.    The District Court failed to properly apply Supreme Court and Circuit precedent by ignoring <u>Chandler v. Miller</u> as well as wholly eschewing any individualized investigation into the different JCCCC employee positions' requirements and responsibilities. . . . . . . . . . . . . . . . . 28

    1.    The District Court failed to analyze or otherwise recognize the Supreme Court's dictates in <u>Chandler v. Miller</u>, especially concerning whether the USDA Drug Testing Regulation is purely symbolic when applied to specific positions. . . . . . . . . . . 28

    2.    The District Court failed to apply Supreme Court and Circuit precedent requiring a Fourth Amendment random suspicionless drug testing analysis to differentiate and distinguish among positions' requirements and responsibilities. . . . . . . . . . . 31

    3.    The District Court improperly applied <u>Vernonia</u> . . . . . . . . . . . . . . . . . . 38

III.    IN GRANTING SUMMARY JUDGMENT FOR THE DEFENDANTS, THE DISTRICT COURT ERRONEOUSLY CONSTRUED FACTS IN FAVOR OF DEFENDANTS TO FIND THAT ALL JCCCC EMPLOYEES CAN BE CONSTITUTIONALLY SUBJECTED TO RANDOM SUSPICIONLESS DRUG TESTING. . . . . . . . . . . . . . . . . 40

IV.    THE DISTRICT COURT SHOULD HAVE GRANTED THE PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION. . . . . . . . . . . . . . . . . 46

CONCLUSION . . . . . . . . . . . . . . . . . . 48

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ii

# <u>TABLE OF AUTHORITIES</u>*

**Cases**

<u>Anderson v. Liberty Lobby</u>, 477 U.S. 242 (1986) . . . . . . . 21, 22

<u>Arrington v. United States</u>, 473 F.3d 329 (D.C. Cir. 2006) . . . . 21

<u>Celotex v. Catrett</u>, 477 U.S. 317 (1986) . . . . . . . . . . . 21, 22

\*     <u>Chandler v. Miller</u>, 520 U.S. 305 (1997)
. . . . . . . . . . . . . .18, 20, 23, 24, 27, 28, 29, 31, 34

<u>CityFed Fin. Corp. v. Office of Thrift Supervision</u>, 58 F.3d 738
(D.C. Cir. 1995) . . . . . . . . . . . . . . . . . .46

<u>Elrod v. Burns</u>, 427 U.S. 347 (1976) . . . . . . . . . . . . .46

<u>First Chicago Int'l v. United Exch. Co., Ltd.</u>, 836 F.2d 1375
(D.C. Cir. 1988) . . . . . . . . . . . . . . . . . 22

<u>Harmon v. Thornburgh</u>, 878 F.2d 484 (D.C. Cir. 1989) . . . . 36, 37

<u>Hartness v. Bush</u>, 919 F.2d 170 (D.C. Cir. 1990) . . . . . . . 37

<u>Katz v. Georgetown Univ.</u>, 246 F.3d 685 (D.C. Cir. 2001) . . . . 45

<u>Mills v. District of Columbia</u>, 571 F.3d 1304 (D.C. Cir. 2009) . . . 46

<u>Nat'l Fed'n of Fed. Employees v. Cheney</u>, 884 F.2d 603
(D.C. Cir. 1989) . . . . . . . . . . . . . . 19, 35, 36, 37

<u>Nat'l Treasury Employees Union v. United States Customs Serv.</u>,
27 F.3d 623 (D.C. Cir. 1994) . . . . . . . . . . . . .23, 37

\*     <u>Nat'l Treasury Employees Union v. Von Raab</u>,
489 U.S. 656 (1989) . . . . . 18, 23, 24, 27, 28, 31, 32, 33, 34

---

\*     Authorities upon which we chiefly rely are marked with asterisks.

Nat'l Treasury Employees Union v. Yeutter, 918 F.2d 968
         (D.C. Cir. 1990)  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  37

*    Skinner v. Ry. Labor Executives' Ass'n,
         489 U.S. 602 (1989)  .  .  .  .  .  .  .  .  .  .  23, 24, 31, 32, 33

*    Stigile v. Clinton, 110 F.3d 801 (D.C. Cir. 1997)  .  .  23, 30, 31, 34, 37

     Vernonia School Dist. 47J v. Acton, 515 U.S. 646 (1995)  .  .  .  38, 39

**Statutes**

U.S. Const. amend. IV  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  22

28 U.S.C § 1291  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  2

28 U.S.C. § 1331  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  2

28 U.S.C. §  2201  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  2

28 U.S.C. § 2892  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  9

29 U.S.C. § 2881(a)  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  5

29 U.S.C. § 2882(3)  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  9

29 U.S.C. § 2884  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  6

29 U.S.C. § 2887(a)(1)(A)  .  .  .  .  .  .  .  .  .  .  .  .  .  5

29 U.S.C. § 2892(b)(2)  .  .  .  .  .  .  .  .  .  .  .  .  .  9, 10

29 U.S.C. § 21101  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  32

**Rules, Regulations, etc.**

Fed. R. App. P. 4(a)(1)(B) . . . . . . . . . . . . . . . . 2

20 C.F.R. 670.540(b) . . . . . . . . . . . . . . . . . 9

20 C.F.R. 670.540(c) . . . . . . . . . . . . . . . . 10

# **GLOSSARY**

CDL - Commercial Driver's License

DOL - U.S. Department of Labor

JA - Joint Appendix

JCC - Job Corps Center

JCCCC - Job Corps Civilian Conservation Center

PD - Position Description

USDA - U.S. Department of Agriculture

USFS - U.S. Forest Service

[NOT YET SCHEDULED FOR ORAL ARGUMENT]

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

No. 11-5135

_____

NATIONAL FEDERATION OF FEDERAL EMPLOYEES – IAM,
Plaintiff-Appellant,

v.

THOMAS J. VILSACK, SECRETARY,
UNITED STATES DEPARTMENT OF AGRICULTURE, et. al.,
Defendants-Appellees

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

BRIEF FOR THE APPELLANT

_____

## STATEMENT OF JURISDICTION

This action sought a declaratory judgment that the United States

Department of Agriculture ("USDA") and United States Forest Service

("USFS") were implementing a random suspicionless drug testing program

1

in violation of the Fourth Amendment to the United States Constitution. Thus, the District Court had subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 2201. On April 6, 2011, the District Court entered a final order granting summary judgment for the Defendants and denying NFFE's *Motion for a Preliminary Injunction*. NFFE filed a timely notice of appeal on May 24, 2011. <u>See</u> Fed. R. App. P. 4(a)(1)(B). This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## <u>STATEMENT OF THE ISSUES</u>

1.    Whether the District Court erred in granting summary judgment to the Defendants prior to allowing Plaintiff the opportunity to pursue and engage in reasonable discovery?

2.    Whether the District Court failed to properly construe facts and inferences in the light most favorable to the non-moving party in granting summary judgment for the Defendants?

3.    Whether the District Court erred in applying the appropriate standard for random suspicionless drug testing of federal employees?

4.    Whether the District Court erred in concluding that the U.S. Department of Agriculture's drug testing policy, which requires random suspicionless drug testing of all U.S. Forest Service Job Corps

Civilian Conservation Center employees, does not violate the Fourth
Amendment to the U.S. Constitution?

5.      Whether the District Court properly denied Plaintiff's Motion for
Preliminary Injunction?

## STATUTES AND REGULATIONS

This a constitutional challenge to an agency policy (the "USDA Drug
Testing Regulation"). As such, there are no pertinent statutes or official
government regulations at issue in this case.

## STATEMENT OF FACTS

Plaintiff National Federation of Federal Employees, FD-1, affiliated
with the International Association of Machinists and Aerospace Workers
(IAM), AFL-CIO ("NFFE") is an unincorporated labor union which
represents employees of the United States Department of Agriculture
("USDA") and United States Forest Service ("USFS"), including USFS
employees who work at 19 Job Corps Civilian Conservation Centers
("JCCCCs"). JA 49 (Pl.'s King Decl., ¶ 5). The Defendants are Thomas J.

Vilsack, Secretary of Agriculture, and Thomas L. Tidwell, Chief of the United States Forest Service, both in their official capacity.

NFFE filed its *Complaint* in the District Court for the District of Columbia on October 13, 2010, seeking a declaratory judgment that the USDA's Drug Testing Regulation violates the Fourth Amendment to the United States Constitution. JA 7 (Compl. p. 3, ¶ 5). NFFE filed a *Motion for Preliminary Injunction* on October 18, 2010 and the Defendants filed their *Opposition to Plaintiff's Motion* on November 5, 2010. No action was taken and the case was transferred to U.S. District Judge Beryl A. Howell on January 21, 2011. Immediately thereafter, Defendants filed a *Motion to Dismiss or, in the Alternative, for Summary Judgment* on January 28, 2011. NFFE submitted its *Opposition to the Defendants' Motion for Summary Judgment* on February 21, 2011. Without a motion hearing, and prior to allowing the parties to engage in discovery, Judge Howell issued her *Order and Memorandum Opinion* ("District Court Opinion") denying NFFE's *Motion for Preliminary Injunction* and granting Defendants' *Motion for Summary Judgment* on April 6, 2011.

4

1.      Job Corps Centers ("JCCs") generally

The Department of Labor ("DOL") administers the Job Corps program which includes 124 Job Corps Centers ("JCCs") throughout the United States. JA 49 (Pl.'s King Decl., ¶ 4); JA 136 (Def.'s Dawson Decl., ¶ 3). Pursuant to statute, the DOL contracts with other government agencies and private organizations to operate the JCCs. 29 U.S.C. § 2887(a)(1)(A). The USFS, a subordinate federal agency within the USDA, operates 28 JCCs at USFS Civilian Conservation Centers in 18 states. JA 49 (Pl.'s King Decl., ¶ 4); JA 136 (Def.'s Dawson Decl., ¶ 3).

The broad purpose of the Job Corps program is "to assist eligible youth . . . to become more responsible, employable, and productive citizens." 29 U.S.C. § 2881(1); JA 136 (Def.'s Dawson Decl., ¶ 3); JA 162 (Def.'s Kopack Decl., ¶ 3) (JCCs offer "the typical range of academic subjects to give students the basic knowledge and skills needed in any vocation"); JA 154 (Def.'s Ryan Decl., ¶ 3); JA 144 (Def.'s Guzik Decl., ¶ 3). There are more than 60,000 enrollees at JCCs nationwide, and approximately 10% (or, 6,200 enrollees) are enrolled at JCCCs operated by the USFS. JA 136 (Def.'s Dawson Decl., ¶ 3). An individual must meet three criteria to be eligible for enrollment in the Job Corps program: (1) between 16 and 24 years old, (2) a low-income individual, and (3) basic

skills deficient, a high school dropout, homeless, a parent, or otherwise in need of additional education or vocational training. 29 U.S.C. § 2884. Fewer than 25% of Job Corps enrollees are under the age of eighteen. JA 136 (Def.'s Dawson Decl., ¶ 4).

2.     The USDA Drug Testing Regulation

In 1995, the USDA issued a drug testing regulation that designated all Job Corps employees within the purview of the agency for random suspicionless drug testing pursuant to guidelines promulgated by the Department of Health and Human Services ("HHS"). JA 50 (Pl.'s King Decl., ¶ 6). At that time, NFFE Representatives, including NFFE Forest Service Council Vice President Larry King, met with USFS officials. JA 50 (Pl.'s King Decl., ¶ 7). NFFE raised a number of concerns about the random testing of all staff, including concerns that the policy as written violated the Fourth Amendment. JA 50 (Pl.'s King Decl., ¶ 7). Following these discussions, the USFS decided not to implement random suspicionless drug testing for JCCCC employees. JA 51 (Pl.'s King Decl., ¶ 8).

In 2003, the USDA issued Departmental Regulation 4430-792-2 ("USDA Drug Testing Regulation") which instituted or retained random suspicionless drug testing for a multitude of agency employees. See JA 67

6

(USDA Drug Testing Regulation).  Positions subject to testing included, for
example, aircraft mechanics, boat operators, employees authorized to carry
firearms, nurses, and various others. JA 82 (Id. at App. A). Additionally, the
USDA Drug Testing Regulation included "Job Corps Center Staff."[1] JA 88-
89 (Id. at App. A., § 14). Nonetheless, the USFS continued to exclude
JCCCC employees from testing. JA 51 (Pl.'s King Decl., ¶ 8).

In September 2010, the USFS decided to bring itself "into
compliance" with the USDA Drug Testing Regulation. JA 51 (Pl.'s King
Decl., ¶ 9); JA 55 (Pl.'s Thatcher Decl., ¶ 3); JA 57 (Pl.'s Patterson Decl., ¶
3); JA 61 (Pl.'s Marnhout Decl., ¶ 3); JA 63 (Pl.'s Case Decl., ¶ 2); JA 65
(Pl.'s Nelson Decl., ¶ 2). Larry Dawson, National Director of the USFS Job
Corps program, wrote a letter to all JCCCC employees ("Dawson Letter")
notifying them of this change in policy. JA 125 (Dawson Letter); JA 51 (Pl.'s
King Decl., ¶ 9); JA 170-71 (Def.'s Supp. Dawson Decl., ¶ 6). The USFS

---

[1]     Appendix A to the USDA Drug Testing Regulation is titled "Position
Titles Designated for Random Testing." Section 14 applying to USDA Job
Corps Center Staff (JCCCC employees) appears limited in that it only
"[i]ncludes any occupational series in which the incumbent may perform
the duties described below." However, the "duties" enumerated are
excessively broad enough to encompass *all* JCCCC employees by defining
these "duties" as "Each Center staff member sees students every day, and
each staff member is responsible for the safety of every student . . . . Also,
each staff member is required to possess a valid driver's license to transport
students . . . . Also, all Center staff personnel are responsible for
administering the Zero Tolerance for Drug Policy."

never notified NFFE of this change. JA 55 (Pl.'s Thatcher Decl., ¶ 4). JCCCC employees were never on actual notice that they would be subjected to suspicionless random drug testing until after the Dawson Letter was issued in September 2010.

Appendix A, § 14 of the USDA Drug Testing Regulation designates *all* JCCCC employees for testing, including employees in more than 30 supervisory and bargaining unit positions. Pl.'s Mot. Prelim. Inj., p. 3. Among the positions tested are Purchasing Agents, Computer Assistants, File Clerks, and Laundry Machine Operators. Id. Purchasing Agents "provide the purchasing/procurement support to the Center." JA 103 (Purchasing Agent PD).  Computer Assistants "perform . . . a variety of duties in the major areas of technical support of various computer systems and business management." JA 97 (Computer Assistant PD). File Clerks "control . . . and maintain . . . a wide variety of files including the performance of these related tasks: receipt of files, review of contents, development of files, filing, purging, and releasing files." JA 93 (File Clerk PD).  A Laundry Machine Operator "receives, checks, and sorts, incoming and outgoing laundry." JA 123 (Laundry Machine Operator PD).   The USDA Drug Testing Regulation treats all JCCCC positions the same despite differences in the duties and responsibilities of many positions.

8

The USDA Drug Testing Regulation only applies to Job Corps employees who work at JCCCCs. The DOL, which administers the Job Corps program, does not require random suspicionless drug testing of private companies' employees who operate the remaining JCCs. JA 51-52 (Pl's King Decl., ¶ 14). Therefore, employees at the other 96 JCCs not operated by the USFS are not subject to the same random suspicionless drug testing requirements as JCCCC federal employees.

3.     Regulation of enrollee drug and alcohol use

29 U.S.C. § 2892 requires all new Job Corps enrollees[2] to submit to a drug test. 29 U.S.C. § 2892(b)(2); 20 C.F.R. 670.540(b) ("all students must be tested for drugs as a condition of enrollment."); JA 137 (Def.'s Dawson Decl., ¶ 7) ("All students entering the Job Corps program must submit to a urinalysis drug test."); see also U.S. DOL Office of Job Corps, Policy and Requirements Handbook, § 6.11(R1)(c)(1) ("New and readmitted students shall be tested for drug use only within 48 hours of arrival on center."). JCCs enforce a zero tolerance policy, requiring dismissal of an enrollee who

---

[2]     29 U.S.C. § 2882 (3) defines "enrollee" as "an individual who has voluntarily applied for, been selected for, and enrolled in the Job Corps program, and remains with the program, but has not yet become a graduate."

9

commits an act of violence, uses, sells or possess a controlled substance, abuses alcohol, or otherwise participates in illegal or disruptive activity. 29 U.S.C. § 2892(b)(2); 20 C.F.R. 670.540(c). An enrollee who tests positive for drug use is placed in a special program and retested after no more than 45 days; a second positive test will result in the enrollee's dismissal from the Job Corps program. JA 137 (Def.'s Dawson Decl., ¶ 8); JA 162-63 (Def.'s Kopack Decl., ¶ 5); JA 154-55 (Def.'s Ryan Decl., ¶ 5); JA 145 (Def.'s Guzik Decl., ¶ 5). While the frequency of positive test results varies by JCC, about 25% or less of new enrollees tests positive for drug use at their initial test. JA 137 (Def.'s Dawson Decl., ¶ 7) (26% tested positive at all JCCs nationally in 2004-05); JA 162-63 (Def.'s Kopack Decl., ¶ 5) (23.2% tested positive at Cass JCCCC in 2009-10); JA 154-55 (Def.'s Ryan Decl., ¶ 5) (approximately 15% of all new enrollees test positive at Anaconda JCCCC); JA 145 (Def.'s Guzik Decl., ¶ 5) (18% tested positive at Trapper Creek JCCCC in 2009-10). Enrollees are always subject to suspicion-based testing at any time if a Job Corps employee reports suspicious behavior and recommends testing. JA 138 (Def.'s Dawson Decl., ¶ 9); JA 163 (Def.'s Kopack Decl., ¶ 6); JA 155 (Def.'s Ryan Decl., ¶ 6); JA 145 (Def.'s Guzik Decl., ¶ 6) (in the 2009-10 program year, 8 out of approximately 224 enrollees, or 3.6%, at Trapper Creek JCCCC tested positive upon suspicion-based testing).

In addition to testing enrollees for drug use upon arrival, the Residential Staff employees will search a new enrollee's luggage for drugs or contraband. JA 163 (Def.'s Kopack Decl., ¶ 7); JA 155 (Def.'s Ryan Decl., ¶ 7); JA 145-46 (Def.'s Guzik Decl., ¶ 7). Residential Staff employees, importantly, are also required to hold a Commercial Drivers License ("CDL") and thus are subject to random drug testing under Department of Transportation regulations. JA 163 (Def.'s Kopack Decl., ¶ 7); JA 155 (Def.'s Ryan Decl., ¶ 7); JA 145-46 (Def.'s Guzik Decl., ¶ 7). Enrollees' residential areas, including personal lockers, are searched randomly for drugs on various schedules at different JCCCCs. JA 163 (Def.'s Kopack Decl., ¶ 7) (Residential Staff search "a number of students every day, chosen at random."); JA 155 (Def.'s Ryan Decl., ¶ 7) (personal spaces "are inspected at least once a week."); JA 145-46 (Def.'s Guzik Decl., ¶ 7) (inspections "at least once a month."). JCCCC employees also search enrollees' luggage upon returning from Summer and Winter breaks. JA 163 (Def.'s Kopack Decl., ¶ 8) ("many employees of the Center – both those who hold CDLs and those who do not – participate in this search."); JA 155 (Def.'s Ryan Decl., ¶ 7) ("These inspection are conducted primarily by residential staff" holding CDLs); JA 146 (Def.'s Guzik Decl., ¶ 8) ("most or all employees . . . participate in this search."). The record contains no policies or directives

11

regarding who participates in the searches. There is no evidence showing the frequency at which these random searches uncover enrollee drug use or possession of contraband.

The Defendants broadly assert that it is "nationwide Job Corps policy" for employees to monitor student behavior for drug use. JA 169-70 (Def.'s Supp. Dawson Decl., ¶ 3); JA 164 (Def.'s Kopack Decl., ¶ 11); JA 155-56 (Def.'s Ryan Decl., ¶ 8); JA 146 (Def.'s Guzik Decl., ¶ 11). However, the record shows that at least some employees, such as Purchasing Agents, have no responsibility for enforcing the zero tolerance policy. JA 59 (Pl.'s Hamann Decl., ¶ 8) ("I have no responsibility for administering the zero tolerance policy"); JA 63 (Pl.'s Case Decl., ¶ 7) (no responsibility). Additionally, other evidence shows that enforcing the policy is merely incidental to the employees' responsibilities. JA 57 (Pl.'s Patterson Decl., ¶ 7) ("I have a general responsibility . . . This merely requires me to report violations"); JA 61 (Pl.'s Marnhout Decl., ¶ 7) (general responsibility); JA 65 (Pl.'s Nelson Decl., ¶ 7) (general responsibility).

4.    **Evidence of drug use and drug-related incidents among JCCCC employees**

There is scant evidence tending to show that there is, or ever was, a drug problem among employees at JCCCCs. JA 51 (Pl.'s King Decl., ¶ 12) ("Neither the USDA nor the USFS has cited any drug use statistics or other evidence as the basis for its determination that random drug testing of all Job Corps Staff is necessary."). The only evidence proffered by the Defendants is that, "Drug use has been found among JCCCC employees in the past, and several employees have been disciplined for drug use in recent years. Review of existing Forest Service disciplinary records show that eight JCCCC employees have been subject to adverse actions . . . in recent years." JA 140-41 (Def.'s Dawson Decl., ¶ 17).   Dawson did not define "recent years" or explain the nature of the incidents giving rise to discipline. The Defendants did not provide any specific instances where JCCCC employee drug use has occurred or caused actual harm to enrollees or other employees.   In fact, the record contains unrefuted evidence that National Director Dawson expressed his view that drug use among JCCCC employees is likely less prevalent than among other, non-USFS Job Corps employees hired by private contractors. JA 52 (Pl.'s King Decl., ¶ 15).

5.    Nature of the JCCCCs and employees' responsibilities.

JCCCCs are operated in rural areas; however, there can be no dispute that JCCCC employees work in a traditional office environment and regularly interact with other employees. JA 127 (Pl.'s Supp. Hamann Decl., ¶ 4) ("JCCCC staff has regular contact with each other on a daily basis."); JA 132 (Pl.'s Supp. Marnhout Decl., ¶ 5) ("I consistently interact with other JCCCC employees, as do the majority of the employees at the JCCCC."). Many JCCCC Position Descriptions explicitly state that the work is to be "performed in an office setting" or that the position requires "normal safety precautions typical of offices." JA 94 (File Clerk PD) ("performed in an office setting"); JA 96 (Office Automation Clerk PD) (involves "safety precautions typical of office settings"); JA 99 (Computer Assistant PD) ("safety precautions typical of offices"); JA 102 (Medical Records Technician PD) ("The work area is usually an . . . office"); JA 105 (Purchasing Agent PD) ("performs work in an office setting involving everyday risks or discomforts"); JA 109 (Training Technician PD) ("Work is usually performed in offices"); JA 114 (Training Instructor PD) (work "performed in offices"); JA 117 (Guidance Counselor PD) ("normal safety precautions typical of . . . offices"); JA 122 (Student Trainee PD) (work "conducted in offices and office areas").

Like many federal employees, JCCCC employees are subject to pre-employment background checks. JA 138-39 (Def.'s Dawson Decl., ¶ 12); JA 170 (Def.'s Supp. Dawson Decl., ¶ 5). However, the background check provided to all JCCCC employees upon hiring, by its own terms, is for "Non Sensitive/Low Risk employees." JA 138-39 (Def.'s Dawson Decl., ¶ 12). Other select employees are subject to "Moderate Risk Background Investigation: Moderate Risk/Public Trust" background checks. JA 138-39 (Def.'s Dawson Decl., ¶ 12). The record is not clear as which employees are subject to the two types of background checks.  Employees are typically rechecked every 15 years. JA 170 (Def.'s Supp. Dawson Decl., ¶ 5). An employee's prior drug-related offense, uncovered during the background check process, is not an automatic bar to employment, but is "used for a suitability determination by hiring officials." JA 138-39 (Def.'s Dawson Decl., ¶ 12).

The evidence is contradictory with regard to the transportation of enrollees.  The extent to which employees actually drive enrollees, if at all, is highly disputed.  Larry Dawson, National Director of the USFS Job Corp program, declared that driving enrollees is a "critical duty of JCCCC employees" and that it is "widespread and commonplace." JA 139 (Def.'s Dawson Decl., ¶ 14).  A number of JCCCC employee positions are required

15

to hold CDLs; as such, these employees are already subject to random drug testing. JA 52 (Pl.'s King Decl., ¶ 16); JA 60 (Pl.'s Hamann Decl., ¶ 12); JA 129 (Pl.'s Supp. Hamann Decl., ¶ 13); JA 132-33 (Pl.'s Supp. Marnhout Decl., ¶ 12); JA 139, 141 (Def.'s Dawson Decl., ¶¶ 14, 18); JA 170-71 (Def.'s Supp. Dawson Decl., ¶ 6). However, many JCCCC employees, holding various positions, declare that they do *not* transport enrollees with any regularity or even in the rarest of circumstances. JA 57 (Pl.'s Patterson Decl., ¶ 6) ("I do not transport students as a regular part of my job"); JA 59 (Pl.'s Hamann Decl., ¶ 7) ("I have no recollection of ever transporting a student"); JA 128-29 (Pl.'s Supp. Hamann Decl., ¶¶ 6-13) (describing the various categories of employees at Mingo JCCCC and the frequency at which various positions may be responsible for driving enrollees); JA 61 (Pl.'s Marnhout Decl., ¶ 6) ("I rarely, if ever, transport students"); JA 132-33 (Pl.'s Supp. Marnhout Decl., ¶¶ 6-12) (describing the frequency at which various employee positions drive enrollees at Pine Knot JCCCC and stating "there are many non-CDL employees who do not have any responsibility for transporting students."); JA 63 (Pl.'s Case Decl., ¶ 6) ("I have not transported students . . . in more than eight or nine years."); JA 65 (Pl.'s Nelson Decl., ¶ 6) ("I do not transport students").

Defendants contend that all JCCCC employees are responsible for the safety of enrollees, "including administering CPR and first aid as required." JA 140 (Def.'s Dawson Decl., ¶ 16). There is no evidence in the record than any JCCCC employee has ever been required to perform CPR or administer anything more than minimal first aid, such as providing band aids. JA 57 (Pl.'s Patterson Decl., ¶ 5); JA 59 (Pl.'s Hamann Decl., ¶ 6); JA 61 (Pl.'s Marnhout Decl., ¶ 5); JA 63 (Pl.'s Case Decl., ¶ 5); JA 65 (Pl.'s Nelson Decl., ¶ 5). Defendants provided no evidence of any major or minor medical events involving enrollees or employees at JCCCCs.

Defendants presented evidence alleging that JCCCC evacuations occur from time to time. Defendants' Declarants stated that a rural JCCCC could potentially face an emergency situation requiring evacuation, and in that case all employees would be called upon to transport enrollees. JA 139-40 (Def.'s Dawson Decl., ¶ 14); JA 167 (Def.'s Kopack Decl., ¶ 18); JA 159 (Def.'s Ryan Decl., ¶ 14); JA 150 (Def.'s Guzik Decl., ¶ 18). However, Defendants only point to one example of a JCCCC ever being evacuated. JA 150 (Def.'s Guzik Decl., ¶ 18) (citing forest fires and floods as *potential* evacuation situations and stating "This Center was, in fact, evacuated in 2000 because of forest fires.") All other evidence concerning evacuations is hypothetical. JA 140 (Def.'s Dawson Decl., ¶ 15) (listing general reasons for

17

alleged recent evacuations); JA 167 (Def.'s Kopack Decl., ¶ 18) ("The most likely scenario for an evacuation . . . would be the occurrence of a tornado" or significant flooding); JA 159 (Def.'s Ryan Decl., ¶ 14) ("The most likely scenario for an evacuation of the Center would be an approaching forest fire" and forest fires have been "within sight" in the past 15 years); <u>but</u> <u>see</u> JA 133 (Pl.'s Supp. Marnhout Decl., ¶ 13) ("Since I have worked at Pine Knot JCCCC, to my knowledge, we have not had any circumstances requiring evacuation."). There is nothing in the record regarding evacuation plans. None of the Position Descriptions have any references to evacuations or other emergency procedures.

## <u>SUMMARY OF ARGUMENT</u>

The District Court in this case found that the USDA Drug Testing Regulation is constitutionally permissible despite its overbroad language designating *all* JCCCC employees for random suspicionless drug testing, including long-time employees with no safety-sensitive, law enforcement, or national security role. The District Court erred. The Court should have denied Defendants Motion and should have found it likely that Plaintiff would succeed on the merits. It is clear that the Drug Testing Regulation unnecessarily designates positions for testing that are not safety-sensitive.

18

The District Court failed to consider the Supreme Court's holding in Chandler v. Miller, 520 U.S. 305 (1997), which is the most recent Supreme Court case on point and post-dates all the cited Circuit case law. The Chandler decision is most significant because it reestablished that Nat'l Treasury Employees Union v. Von Raab, 489 U.S. 656 (1989), is "hardly a decision opening broad vistas for suspicionless testing," and Chandler also insisted that Von Raab must be read in "its unique context." Chandler, 520 U.S. at 320. The District Court ignored Chandler's several teachings.

First, providing notice of drug testing and limiting the testing's intrusiveness will not be sufficient to overcome the Fourth Amendment's prohibition on unreasonable searches if the testing is performed for purely symbolic reasons. In other words, using drug testing to demonstrate a program's integrity is not enough to justify the search. Second, whether an employee works in a traditional office setting is a significant factor. Third, the Chandler Court stressed that "A demonstrated problem of drug abuse, while not in all cases necessary to the validity of a testing regime . . . would shore up an assertion of special need for a suspicionless general search program." Where the government cannot show evidence of a drug problem among employees, it must overcome a higher burden to establish a legitimate interest in the testing scheme.

19

The District Court also erred by failing to analyze the responsibilities associated with each employee position designated for random suspicionless drug testing.  Both Supreme Court and D.C. Circuit case law make clear that the court should review the requirements and responsibilities of each employee position or class of similarly situated positions.  See e.g. Nat'l Fed'n of Fed. Employees v. Cheney, 884 F.2d 603, 611, 613 (D.C. Cir. 1989) (differentiating between employees engaged in drug counseling and those involved in "chain of custody" aspects of the Army's drug testing process; seeking additional information on secretaries in nuclear surety program.).

Finally, the District Court seized upon certain facts to hold that the mission of the Job Corps program generally justifies the random suspicionless drug testing of *all* JCCCC employees.  However, in doing so, the District Court clearly failed to construe the facts and draw inferences in favor of NFFE.  Moreover, many of the facts upon which the District Court relied are insufficient to overcome the lack of a nexus between employees' responsibilities and the risk of immediate harm necessary to permit the random suspicionless drug testing of JCCCC employees.

The District Court denied NFFE's request for a preliminary injunction and dismissed the action on pre-discovery summary judgment without so

20

much as a motion hearing. This might suggest that the challenge lacked any merit. Yet the employees represented by NFFE hold numerous positions in which they do not carry firearms, have no access to sensitive information, do not transport Job Corps enrollees, and are not involved in the direct interdiction of drugs for law enforcement purposes. These elements typically have been the indicia upon which the Supreme Court and this Circuit have upheld random suspicionless drug testing. Simply stated, these individual incumbent employees do not "fit within the closely guarded category of constitutionally permissible suspicionless searches." Chandler, 520 U.S. at 309. The USDA Drug Testing Regulation pertaining to JCCCC employees should be declared overbroad and unconstitutional.

## **ARGUMENT**

## I.    SUMMARY JUDGMENT AND FOURTH AMENDMENT STANDARDS OF REVIEW

### A.    The Circuit Court of Appeals reviews a grant of summary judgment *de novo* and must construe the facts in the light most favorable to the Appellant

The Circuit Court of Appeals reviews a grant of summary judgment *de novo*. Arrington v. United States, 473 F.3d 329, 333 (D.C. Cir. 2006). Summary judgment is appropriate "if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (2011); <u>Celotex v. Catrett</u>, 477 U.S. 317, 322 (1986); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247 (1986); <u>Arrington</u>, 473 F.3d at 333. In adjudicating a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party. <u>Anderson</u>, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."); <u>Arrington</u>, 473 F.3d at 335 ("We review *de novo* the District Court's grant of summary judgment to appellees, viewing all of the evidence in the light most favorable to appellant.").

Summary judgment should only be granted once "all parties [are] given a 'reasonable opportunity to present all material made pertinent to such a motion by Rule 56.'" <u>First Chicago Int'l v. United Exch. Co., Ltd.</u>, 836 F.2d 1375, 1380 (D.C. Cir. 1988). "Furthermore, it is settled that the term 'reasonable opportunity' includes the opportunity 'to pursue reasonable discovery.'" <u>Id.</u> (citing <u>Celotex</u>, 477 U.S. at 323 (summary judgment appropriate "after adequate time for discovery."); <u>see also</u> <u>Anderson</u>, 477 U.S. at 273 (plaintiff must have "a full opportunity to conduct discovery").

B. **The Fourth Amendment prohibits random suspicionless drug testing unless a legitimate governmental interest outweighs the employee's constitutional privacy interest**

The Fourth Amendment to the United States Constitution states "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV.

It is well-established that drug and alcohol tests conducted by the government are searches within the meaning of the Fourth Amendment. Chandler v. Miller, 520 U.S. 305, 313 (1997);  Nat'l Treasury Employees Union v. Von Raab, 489 U.S. 656, 665 (1989);  Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 616 (1989) (compelled physical intrusion into a person's body for drug and alcohol testing "infringes an expectation of privacy that society is prepared to recognize as reasonable."); Stigile v. Clinton, 110 F.3d 801, 803 (D.C. Cir. 1997); Nat'l Treasury Employees Union v. United States Customs Serv., 27 F.3d 623, 626 (D.C. Cir. 1994) (hereinafter, "Customs Service"). As such, government-mandated drug testing is subject to the *reasonableness* requirement of the Fourth Amendment. Chandler, 520 U.S. at 313 ("we focus on the question: Are the

23

searches reasonable?"); <u>Von Raab</u>, 489 U.S. at 665 ("in view of our holding in *Railway Labor Executives* that urine tests are searches, it follows that the Customs Service's drug-testing program must meet the reasonableness requirement of the Fourth Amendment."); <u>Skinner</u>, 489 U.S. at 619 ("For the Fourth Amendment does not proscribe all searches and seizures, but only those that are unreasonable.").

Generally, Government searches are unreasonable when there is an absence of individualized suspicion. <u>Chandler</u>, 520 U.S. at 308. However, the Supreme Court has carved out "certain limited circumstances" in which a suspicionless search is permissible. <u>Id.</u> at 308-09 ("the closely guarded category of constitutionally permissible suspicionless searches."). In determining what searches are reasonable, courts must balance the search's "intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." <u>Skinner</u>, 489 U.S. at 619 ("What is reasonable, of course, 'depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself.'"). This balancing test is invoked where special governmental needs, beyond the normal need for law enforcement, make individualized suspicion impractical. <u>Id.</u>; <u>see</u> <u>also</u> <u>Chandler</u>, 520 U.S. at 313-14; <u>Von Raab</u>, 489 U.S. at 665-66.

24

## II.   THE DISTRICT COURT MISAPPLIED THE CASE LAW AND INCORRECTLY LOWERED THE DEFENDANTS' BURDEN TO DEMONSTRATE A LEGITIMATE GOVERNMENTAL INTEREST

### A.   The USDA Drug Testing Regulation is overbroad and NFFE's action focused on the individualized job requirements and responsibilities of different JCCCC employee positions

The primary basis for NFFE's challenge to the USDA Drug Testing Regulation was that it covered *every* JCCCC employee, regardless of the requirements or responsibilities of the individual employee's position. See generally JA 5 (Pl.'s Compl.); Pl.'s Mot. Prelim. Inj.; Pl.'s Opp. Def. Mot. Summ. J. A position-specific inquiry is necessary for determining the reasonableness of a random suspicionless drug testing scheme, and the District Court's failure to distinguish among different JCCCC employee positions was improper. By designating *all* JCCCC employees for testing, the USDA Drug Testing Regulation is inconsistent with the Fourth Amendment.

To illustrate why applying random suspicionless drug testing to *all* JCCCC employees is unreasonable, NFFE presented evidence regarding Jerry Case, a Purchasing Agent at Curlew JCCCC. See JA 63 (Pl.'s Case Decl.). Mr. Case has been a federal employee since 1979 and a Purchasing Agent at Curlew since 1992. JA 63 (Pl.'s Case Decl., ¶ 1). Mr. Case declared

under penalty of perjury that he has no responsibility for enforcing the zero tolerance policy, has limited contact with enrollees, and does not transport enrollees. JA 63 (Id. at ¶¶ 4, 6-7). His position is administrative in nature and focuses on the procurement of supplies for the Curlew JCCCC. JA 63 (Id. at ¶ 4). He works in an office environment and interacts with other employees. See JA 103 (Purchasing Agent PD). He has never been asked to take a drug test based on reasonable suspicion. JA 63 (Pl.'s Case Decl., ¶ 3).

The USDA Drug Testing Regulation also subjects Lance Hamann to random suspicionless drug testing. [3] As with Jerry Case, Mr. Hamann is a Purchasing Agent based at the Mingo JCCCC in Puxico, Missouri. See JA 59 (Pl.'s Hamann Decl.). Mr. Hamann's Declaration is consistent with Case's in stating that he has no responsibility for enforcing the zero tolerance policy. JA 59 (Pl.'s Hamann Decl., ¶ 8). He performs administrative tasks and has limited contact with enrollees. JA 59 (Id. at ¶ 5); see also JA 103 (Purchasing Agent PD). His primary responsibility is to procure items for the Mingo JCCCC.  He does not transport students and has been a federal employee for over a decade. JA 59 (Pl.'s Hamann Decl., ¶¶ 1, 7). Disregarding their long tenure and the administrative nature of their

---

[3]    These are merely two examples showing the unreasonable breadth of the drug testing program. NFFE asserts that numerous other positions have been improperly designated for testing in violation of the Fourth Amendment.

position, the District Court nonetheless held that the USDA Drug Testing Regulation subjecting Purchasing Agents Case and Hamann to random suspicionless drug testing is constitutionally permissible.

The duties of other positions vary considerably, demonstrating the need to conduct a position-specific analysis. For instance, there are two types of counselors employed at JCCCCs. JA 128 (Pl.'s Supp. Hamann Decl., ¶ 9). Drug and Alcohol Counselors, as the title implies, help enrollees with overcoming issues of drug and alcohol abuse; on the other hand, Guidance Counselors focus entirely on "Educational and Vocational Counseling." JA 115 (Guidance Counselor PD). There are employees that serve as Office Clerks and Computer Assistants while other employees operate welding equipment. Since the traditional Fourth Amendment analysis centers on the immediacy of the harm that could be caused by a drug-impaired employee, a position-specific analysis is absolutely required.

In reaching the holding that Mr. Case and Mr. Hamann, among other employees, are subject to random suspicionless drug testing, the District Court failed to properly apply the holdings in Chandler, Von Raab, and this Circuit's case law which review the requirements and responsibilities of employee positions designated for random suspicionless drug testing.

27

**B.**  **The District Court failed to properly apply Supreme Court and Circuit precedent by ignoring *Chandler v. Miller* as well as wholly eschewing any individualized investigation into the different JCCCC employee positions' requirements and responsibilities**

The District Court erred in applying Supreme Court and Circuit case law. Specifically, the Court did not analyze <u>Chandler</u> and its discussion of the holding in <u>Von Raab</u>. Moreover, by focusing on the overall nature of the JCCCCs and not analyzing each position covered by the USDA Drug Testing Regulation, the District Court failed to properly apply the Fourth Amendment balancing test in determining whether the testing of each employee is reasonable.

   1.   *The District Court failed to analyze or otherwise recognize the Supreme Court's dictates in <u>Chandler v. Miller</u>, especially concerning whether the USDA Drug Testing Regulation is purely symbolic when applied to specific positions*

The District Court's Opinion is curiously devoid of any meaningful discussion of <u>Chandler</u>. In that case, the Supreme Court held unconstitutional Georgia's requirement that candidates for public office submit to drug testing. <u>Chandler</u>, 520 U.S. at 308. <u>Chandler</u>'s discussion of <u>Von Raab</u> is controlling because the Supreme Court expressed that <u>Von</u>

28

Raab was ""hardly a decision opening broad vistas for suspicionless testing" and insisted that Von Raab must be read in "its unique context." Id. at 320. Stated differently, a determination that extends random suspicionless drug testing to any typical federal employee, such as an Office Clerk or a Purchasing Agent, is an improper application of Von Raab.

The Chandler Court found that Georgia's testing procedures were "relatively noninvasive." Id. at 318. Indeed, the Georgia law allowed the candidate to obtain a drug test at his personal physician's office. Id. at 310. However, the Supreme Court nonetheless struck down the testing scheme because there was (1) no evidence of a drug problem among candidates for public office, (2) the officials in question "typically do not perform high-risk, safety-sensitive tasks," and (3) the testing did not serve any immediate interdiction effort. Accordingly, Georgia's drug testing program was purely "symbolic." Id. at 321-22. The Court concluded: "However well meant, the candidate drug test Georgia has devised diminishes personal privacy for a symbol's sake. The Fourth Amendment shields society against that state action." Id. at 322. While the testing procedures Georgia implemented were minimally intrusive, the testing scheme unconstitutionally infringed on candidates' privacy interests for purely symbolic reasons.

The District Court, again with no discussion of <u>Chandler</u>, cited to case law finding HHS testing to be minimally intrusive, but failed to recognize that minimally intrusive testing and advance notice are not sufficient to justify random suspicionless drug testing if the testing is purely symbolic and not linked to any concrete risk.  A review of the duties of the Purchasing Agents described above amply demonstrates that testing *all* JCCCC employees is a purely symbolic gesture, showing that the USFS leadership's motivation was compliance with written USDA policy and not the prevention of any foreseeable danger. <u>See</u> JA 125 (Dawson Letter).

It is significant that the DOL, which mandates the testing of enrollees, has never required random suspicionless drug testing of Job Corps employees, nor is there any indication that the DOL is moving in that direction. JA 51-52 (Pl.'s King Decl., ¶14).  If the safe operation of Job Corps Centers depends on the random suspicionless drug testing of *all* employees, then the DOL, as administrator of the Job Corps program, would promulgate such a regulation for employees at *all* JCCs.

It is also notable that the USFS has not mandated the random suspicionless drug testing of its contract employees. The District Court cited to <u>Stigile</u> for the proposition that the government need not address all potential safety issues simultaneously in order to justify random

30

suspicionless drug testing under the Fourth Amendment. However, the District Court concurrently bases its holding on the notion that JCCCC employees have been on notice of testing since 1995. The Defendants cannot have it both ways. To say that there has been employee notice for over 15 years belies the notion that intermittent implementation is permissible. <u>Stigile</u>, 110 F.3d at 807 ("We cannot require the government to attack all aspects of a problem before we will uphold its right to act against a single aspect."). The Government cannot initiate testing piecemeal and yet maintain that the problem, and solution, has been in existence since 1995. The Defendants' recent about-face only strengthens the conclusion that implementation is a purely symbolic gesture.

> 2.   *The District Court failed to apply Supreme Court and Circuit precedent requiring a Fourth Amendment random suspicionless drug testing analysis to differentiate and distinguish among positions' requirements and responsibilities*

Determining whether a governmental interest in random suspicionless drug testing is legitimate requires a context-specific analysis. <u>Chandler</u>, 520 U.S. at 314 ("When such 'special needs' – concerns other than crime detection – are alleged in justification of a Fourth Amendment intrusion, courts must undertake a context-specific inquiry, examining

31

closely the competing private and public interests advanced by the parties."); see also Skinner, 489 U.S. at 619 ("in the particular context"); Von Raab, 489 U.S. at 665-66; Stigile, 110 F.3d at 804 ("*Skinner* and *Von Raab* require us rather to perform a case-by-case balancing of interests. Despite the fact-specific nature of this inquiry, there are certain broad themes in the case law that guide us in our disposition of this case."). The government's asserted interest must be substantial enough to override the employees' privacy interests. Chandler, 520 U.S. at 318 ("Our precedents establish that the proffered special need for drug testing must be substantial – important enough to override the individual's acknowledged privacy interest, sufficiently vital to suppress the Fourth Amendment's normal requirement of individualized suspicion.").

The initial Supreme Court cases upholding suspicionless drug testing – Skinner and Von Raab – both analyzed the duties and responsibilities of the positions designated for testing. In Skinner, the covered employees were those who were involved in the movement of trains, such as engineers and dispatchers.[4] Skinner, 489 U.S. at 608. Other employees engaged in administrative or clerical functions, for example, were not covered by the testing regulations. In Von Raab, the Court analyzed whether the specific

---

[4]     The "covered employees" in Skinner were employees subject to the Hours of Service Act. 29 U.S.C. § 21101.

category of gun-carrying Customs Service agents could be constitutionally subjected to applicant testing. <u>Von Raab</u>, 489 U.S. at 659-61.

In <u>Skinner</u>, the drug testing regulation was promulgated in response to a series of railroad accidents involving dozens of fatalities and millions of dollars in property damage. <u>Skinner</u>, 489 U.S. at 606-08. Studies conducted by the Federal Railroad Administration concluded that these accidents were significantly linked to on-the-job drug and alcohol intoxication of railroad employees. <u>Id.</u> at 606 ("The problem . . . is as old as the industry itself"), 607 (between 1972-1983, at least 21 significant train accidents involved drug or alcohol use as "a probably cause or contributing factor"), 607 n.1 (at least 1/8 drank on the job, 5% reported to work "very drunk," 13% reported to work "a little drunk," and 23% were "problem drinkers."). The Supreme Court held that the agency's interest in conducting post-accident suspicionless drug testing of railroad employees was legitimate because the employees were engaged in safety-sensitive tasks where "even a momentary lapse of attention can have disastrous consequences." <u>Id.</u> at 628.

Likewise, the Supreme Court in <u>Von Raab</u> upheld random suspicionless drug testing for Customs Service border agents based on recorded evidence and risks associated with the agents' duties. <u>Von Raab</u>,

489 U.S. at 679. The agency documented numerous instances of violence against employees, incidents of threats or bribery, and dozens of criminal arrests of border agents. Id. at 669-70.  This evidence, coupled with the "extraordinary safety and national security hazards" attendant to drug-dependant border agents, let the Court to hold that the agency had a legitimate interest in suspicionless applicant drug testing. Id. at 674. Weighing heavily among these safety hazards was the fact that employees carried firearms and, again, "even a momentary lapse of attention can have disastrous consequences." Id. at 670.

In contrast, Chandler held that, where the drug testing regime lacked any evidence of a problem and any connection to public safety, it was unconstitutional. Chandler, 520 U.S. at 323. The Court held that evidence of a drug problem was beneficial to the determination of governmental interest. Id. at 319 ("A demonstrated problem of drug abuse, while not in all cases necessary to the validity of a testing regime . . . would shore up an assertion of special need for a suspicionless general search program."). Recognizing Von Raab's "unique context," the Court invalidated Georgia's drug testing requirement because the state failed to identify any actual, non-symbolic reasons justifying candidate testing and the scheme lacked the requisite safety nexus. Id. at 323 ("But where, as in this case, public

34

safety is not genuinely in jeopardy, the Fourth Amendment precludes the suspicionless search, no matter how conveniently arranged.").

The cases in this Circuit have also adhered to the nexus requirement that "there be an immediate, non-attenuated connection between the employee's drug use and the danger to be avoided," which requires a discussion of the employee positions' requirements and responsibilities. Stigile, 110 F.3d at 805 ("The public safety rationale adopted in *Von Raab* and *Skinner* focused on the *immediacy* of the threat."). As established, an investigation of many JCCCC employee positions (such as the Purchasing Agents discussed above) reveals the utter lack of a nexus between the employee's responsibilities and any foreseeable, immediate harm.

In Nat'l Fed'n of Fed. Employees v. Cheney, 884 F.2d 603 (D.C. Cir. 1989), this court held that the Army could randomly drug test civilians who fly and service aircraft because "A single drug-related lapse by any covered employee could have irreversible and calamitous consequences." Cheney, 884 F.2d at 610. Also permitted was random suspicionless drug testing of civilian police and guards because "The threat to public safety posed by drug-impaired, gun-toting civilian officers is manifest." Id. at 612. Interestingly, this court permitted the random drug testing of drug counselors but not "chain of custody" employees. Id. at 613-14. The drug

35

counselors were permissibly subject to random suspicionless drug testing because allegiance "to their essential mission" would be frustrated by drug use and, in turn, this would frustrate the "effective treatment and rehabilitation" of critical Army personnel. Id. at 614. However, the random suspicionless drug testing of "chain of custody" employees was held to be unconstitutional because "a drug-related lapse by such an employee does not portend either direct or irreparable harm . . . testing these employees lacks the necessary causal connection." Id.

It is also important to note that the Cheney court could not reach a conclusion on the random suspicionless drug testing of "chemical and nuclear surety positions," which, similar to the JCCCCs included varied positions ranging from secretaries to animal caretakers. Because the record was insufficient to establish the reasonableness of the testing vis–à–vis these employees' responsibilities, the court remanded for further proceedings. Id. at 611-12. It is not difficult to infer that the operational realities of the JCCCCs are far less sensitive than those of a group handling nuclear material.

The District Court Opinion is fundamentally tainted by its failure to recognize that JCCCC employees occupy a wide variety of positions with distinct requirements and responsibilities. See JA 128-29 (Pl.'s Supp.

Hamann Decl., ¶¶ 7-13); JA 132-33 (Pl.'s Supp. Marnhout Decl., ¶¶ 7-12). This Circuit's precedent clearly establishes that it will uphold random suspicionless drug testing as constitutional on a position-by-position basis. For example, in Harmon v. Thornburgh, 878 F.2d 484 (D.C. Cir. 1989), this court rejected the Department of Justice's integrity argument in favor of a position-specific analysis. Harmon, 878 F.2d at 490-91 ("The government has not so far identified a separate category of drug prosecutors, but instead has required that *all* employees who prosecute criminal cases must undergo random testing. . . . We therefore conclude that the government's integrity interest cannot justify the testing of any one of the three broad categories at issue here."); see also Stigile, 110 F.3d at 806-07 (differentiating between permanent passholders and those with more limited access); Cheney, 884 F.2d 603 (differentiating among employee positions and responsibilities); Nat'l Treasury Employees Union v. Yeutter, 918 F.2d 968 (D.C. Cir. 1990) (addressing position of Motor Vehicle Operators). Here, the District Court made generalized conclusions about the responsibilities of JCCCC employees, allowing it to avoid weighing the evidence in the light most favorable to NFFE or making position-specific inquiries regarding employees' requirements or responsibilities.

To be sure, this Circuit has previously approved testing for a class of employees with a common attribute rather than distinguishing among specific positions. These cases, however, have primarily concerned employees who have some connection to national security. See Customs Service, 27 F.3d at 623 (employees having access to databases with national security information); Harmon, 878 F.2d at 491-92 (employees with Top Secret clearances); Hartness v. Bush, 919 F.2d 170, 171 (D.C. Cir. 1990) (employees with Secret clearances); Stigile, 110 F.3d at 803 (OMB employees with access to the President and Vice President). There is no similar basis here for treating *all* JCCCC employees as one class of employees. The declarations and JCCCC Position Descriptions demonstrate that the duties of employees vary widely. There is no rationale for treating the Welder and the Office Clerk exactly the same for the purpose of determining whether there exists a special governmental need for random suspicionless drug testing.

### 3.     The District Court improperly applied Vernonia

While the District Court ignored Chandler, it cited several times to Vernonia School Dist. 47J v. Acton, 515 U.S. 646 (1995), to support its contention that testing is proper since JCCCC employees serve as "role

38

models" to enrollees.  In <u>Vernonia</u>, the Supreme Court addressed a school board policy which subjected high school student athletes, but not other students, to drug testing. <u>Vernonia</u>, 515 U.S. at 650. In upholding the testing policy, the Supreme Court relied on evidence that the student athletes were known to use drugs and that they served as role models to other students. <u>Id.</u> at 649 ("Not only were student athletes included among the drug users but, as the District Court found, athletes were the leaders of the drug culture.").

The District Court's reliance on <u>Vernonia</u> is misplaced for several reasons. First, there was strong evidence of a drug problem among the targeted group of "role models," not unlike the train operators in <u>Skinner</u>. Here, there is no suggestion of a pervasive drug problem among the JCCCC employees or that JCCCC staff are "leaders of the drug culture." Second, <u>Vernonia</u> is of questionable application here since it concerned the diminished privacy expectations of unemancipated minors and the government's compelling interest in protecting drug-using athletes from the immediate risk of physical harm present in sports. <u>Id.</u> at 654 ("Central, in our view, to the present case is the fact that the subjects to the Policy are (1) children, who (2) have been committed to the temporary custody of the State as schoolmaster.") The constitutional rights of the JCCCC employees

are afforded much greater protections. It must also be noted that <u>Chandler</u> concerned candidates who might one day hold the position of Governor or Attorney General.  Certainly, the people in these positions serve as role models for the state and are integral to the enforcement of laws, including those laws prohibiting drug use. Nonetheless, the Supreme Court rejected the idea that testing candidates for those offices was constitutional. Focusing on the role model effect of JCCCC employees is symbolic.

### III.   IN GRANTING SUMMARY JUDGMENT FOR THE DEFENDANTS, THE DISTRICT COURT ERRONEOUSLY CONSTRUED FACTS IN FAVOR OF DEFENDANTS TO FIND THAT ALL JCCCC EMPLOYEES CAN BE CONSTITUTIONALLY SUBJECTED TO RANDOM SUSPICIONLESS DRUG TESTING

In order to justify upholding random suspicionless drug testing for *all* JCCCC employees, the District Court identified certain facts in common with some or all employees and used those to justify the breadth of the USDA Drug Testing Regulation.  To do so, however, the Court construed the facts in favor of the Defendants, which is improper when ruling on a motion for summary judgment.

First, the District Court essentially found that *all* JCCCC employees hold safety-sensitive positions. However, the evidence, if construed in favor

of NFFE, hardly allows for this finding. The District Court found that the rural settings of JCCCCs made it likely that each employee could at some unspecified point in the future engage in safety-sensitive activities. However, nowhere in the case law is a rural setting dispositive of a special need for suspicionless testing. Rather, the courts have examined whether the employees are in a typical office setting. NFFE's evidence undoubtedly establishes that JCCCC employees work in traditional office settings where they interact with one another frequently. <u>See</u> JA 127 (Pl.'s Supp. Hamann Decl., ¶ 4); JA 132 (Pl.'s Supp. Marnhout Decl., ¶ 5); <u>see generally</u> JA 93-124 (JCCCC Position Descriptions); JA 105 (Purchasing Agent PD) ("The employee performs work in an office setting involving everyday risks or discomforts. Normal safety precautions are adequate."). The voluminous evidence NFFE presented to show that employees operate in traditional office settings was not given the proper weight in the District Court's holding that the "occupational responsibilities" weigh in favor of summary judgment for the Defendants.

The District Court accepted the Defendants' evidence that all JCCCC employees are "responsible for the safety" of enrollees. NFFE's evidence, however, shows that different JCCCC employees have different levels of responsibility for safety, both in theory and in practice. While the

employees are trained in CPR and First Aid, there is no evidence in the record to suggest an employee has ever provided CPR. The only evidence of employees providing First Aid is the providing of the occasional band aid. See JA 57 (Pl.'s Patterson Decl., ¶ 5); JA 59 (Pl.'s Hamann Decl., ¶ 6); JA 61 (Pl.'s Marnhout Decl., ¶ 5); JA 63 (Pl.'s Case Decl., ¶ 5); JA 65 (Pl.'s Nelson Decl., ¶ 5). Moreover, there are nurses, who are already subject to drug testing, who work at the JCCCCs.  It is not difficult to infer that the Nurse will be the employee to provide CPR or First Aid in a real emergency. Residential Staff, who reside on-site and work off-hours, hold CDLs and are already tested under Department of Transportation regulations. If the evidence had been viewed in the light most favorable to NFFE, then the District Court would have found that there is no substantiated safety-sensitive component for *all* JCCCC employees.

Second, the District Court made a finding that some employees transport enrollees and that at some unspecified point in time, all staff may transport enrollees. This fact is highly disputed.  A proper inference in favor of NFFE would find that many JCCCC employees do not transport enrollees. The District Court Opinion even accepts that JCCCC employees are required to hold a drivers license even though the Defendant's own evidence indicates otherwise. JA 139-40 (Def.'s Dawson Decl., ¶ 14).

Regardless of whether JCCCC employees possess valid driver's licenses, NFFE's evidence clearly shows that many JCCCC employees are not required to transport enrollees and, in fact, many employees never drive enrollees. See JA 57 (Pl.'s Patterson Decl., ¶ 6); JA 59, 60 (Pl.'s Hamann Decl., ¶¶ 7, 12); JA 128-29 (Pl.'s Supp. Hamann Decl., ¶¶ 6-13); JA 61 (Pl.'s Marnhout Decl., ¶ 6); JA 132-33 (Pl.'s Supp. Marnhout Decl., ¶¶ 6-12); JA 63 (Pl.'s Case Decl., ¶ 6); JA 65 (Pl.'s Nelson Decl., ¶ 6).

The District Court also attempted to show the safety-sensitive nature of all JCCCC employees by finding that in an emergency situation, all staff, even those without CDLs, may assist in transporting enrollees in the event of an evacuation. This evacuation scenario is purely speculative. The Defendants' evidence alleges vague incidents of evacuations; however, NFFE's evidence shows that evacuations do not actually occur with any foreseeable regularity. See JA 133 (Pl.'s Supp. Marnhout Decl., ¶ 13). Regarding the one evacuation cited, which occurred more than a decade ago, the Defendants provided no information regarding who actually evacuated the enrollees. Additionally, there is no evidence regarding evacuation plans or other documents to show that non-CDL holders have a role in JCCCC evacuations. Had the District Court viewed the evidence in the light most favorable to NFFE, and accepted as true the NFFE's

43

evidence, then it would not have been able to conclude that the *threat* of evacuations converts a typical office employee into a safety-sensitive employee.

The District Court also erred by inferring that all JCCCC employees are akin to the Drug and Alcohol counselors in <u>Cheney</u>. This is a flawed application of the facts to the law. The JCCCCs have specific Drug and Alcohol Counselors. JA 132 (Pl.'s Supp. Marnhout Decl., ¶7); JA 128 (Pl.'s Supp. Hamann Decl., ¶9). NFFE's evidence conclusively establishes that some employees are not personally responsible for enforcing the zero tolerance policy. JA 59 (Pl.'s Hamann Decl., ¶ 8); JA 63 (Pl.'s Case Decl., ¶ 7). For other employees, the enforcement is merely incidental to their duties and they rarely, if ever, have encountered violations of the policy. <u>See</u> JA 57 (Pl.'s Patterson Decl., ¶ 7); JA 61 (Pl.'s Marnhout Decl., ¶ 7); JA 65 (Pl.'s Nelson Decl., ¶ 7). The District Court should have given more weight to NFFE's evidence regarding employee responsibility for enforcing the zero tolerance policy.[5]

It must also be noted that these employees are not law enforcement officers and are not involved in drug interdiction duties such as the <u>Von</u>

---

[5]     Again, the positions' requirements and responsibilities are highly relevant. It is not difficult to infer that Residential Staff are more likely to encounter violations of the zero tolerance policy than a Teacher.

Raab border agents. The employees are not dealing with drug cartels nor are they likely to encounter vast quantities of drugs. The enrollees, to be eligible for the Job Corps program, must be economically disadvantaged and, therefore, JCCCC employees are not likely to be subject to bribery as border agents might be in dealing with cartels.  Accordingly, the District Court dramatically overstated the importance of the employees' incidental responsibility for enforcement of the zero tolerance policy.

The District Court also found that the employees have been on notice regarding testing since 1995 and thus have a lower expectation of privacy. This represents the clearest example of the District Court's failure to construe the facts in favor of Plaintiff. While the USDA issued the original drug testing regulation in 1995, it was never implemented and it can only be inferred by the USFS's actions that there was no plan to implement it. None of the Position Announcements or Position Descriptions over this time included any reference to the potential for random suspicionless drug testing to put employees on notice. There are no other documents in the record to suggest the employees had a belief that suspicionless drug testing would be adopted. The agency's *ex post facto* revision of these Position Descriptions to include the possibility for random suspicionless drug

testing cannot overcome the fact that incumbent employees were never on actual notice of potential testing.

None of the facts common to all employees support a finding that all employees can be permissibly subjected to random suspicionless drug testing.

## IV.  THE DISTRICT COURT SHOULD HAVE GRANTED THE PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

The Court of Appeals reviews a decision regarding a preliminary injunction for abuse of discretion. Katz v. Georgetown Univ., 246 F.3d 685, 688 (D.C. Cir. 2001). A preliminary injunction is appropriate when the plaintiff demonstrates "1) a substantial likelihood of success on the merits, 2) that [they] would suffer irreparable injury if the injunction is not granted, 3) that an injunction would not substantially injure other interested parties, and 4) that the public interest would be furthered by the injunction.'" Mills v. District of Columbia, 571 F.3d 1304, 1308 (D.C. Cir. 2009) (quoting CityFed Fin. Corp. v. Office of Thrift Supervision, 58 F.3d 738, 746 (D.C. Cir. 1995)). "If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." CityFed Fin. Corp., 58 F.3d at 747. "It has long been

established that the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" <u>Mills</u>, 571 F.3d at 1312 (<u>quoting</u> <u>Elrod v. Burns</u>, 427 U.S. 347, 373 (1976)).

As discussed above, NFFE is likely to show that the USDA Drug Testing Regulation is impermissibly broad. Additionally, the governmental interest is relatively weak whereas the JCCCC employees' privacy interest is strong. Permitting the random suspicionless drug testing to proceed would irreparably harm JCCCC employees by denying them their Fourth Amendment right against unreasonable government searches. Where, as here, this one factor is so strong then a preliminary injunction should be granted.

Finally, with regard to the final two elements of the injunction standard, the government will not be prejudiced. As noted, there is nothing in the record that suggests any particular problems have occurred at JCCCCs. The DOL does not require random suspicionless drug testing of employees at other JCCs. Additionally, the USDA is free to revise its drug testing policy so that it complies with the Fourth Amendment and only subjects employees to testing where necessary. Such revision could be implemented quickly if necessary. Thus, the government would not be substantially injured by a preliminary injunction and, undoubtedly, the

public interest can only be served by protecting employees' Constitutional rights.

For the reasons discussed above, the Defendants' random suspicionless drug testing scheme is not buttressed by a legitimate governmental purpose, and therefore the regulation presents a serious violation of JCCCC employees' Constitutional rights. As such, the District Court should have found that NFFE would suffer irreparable harm and granted Plaintiff's *Motion for Preliminary Injunction*.

## <u>CONCLUSION</u>

For the foregoing reasons, the District Court's grant of summary judgment for the Defendants should be reversed and this Court should grant NFFE's request for a preliminary injunction.

Respectfully submitted,

<u>/s/ Stefan P. Sutich</u>
Stefan P. Sutich, Esq.
General Counsel
National Federation of Federal
Employees, Federal District-1,
Int'l Assoc. Of Machinists and
Aerospace Workers, AFL-CIO
805 15th Street N.W., Suite 500
Washington, D.C. 20005
202-216-4457

48

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(A)</u>

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains **9,688 words**, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2007  in **14 point Georgia font**.

 /s/ Stefan P. Sutich
Stefan P. Sutich, Esq.
General Counsel
National Federation of Federal
Employees, Federal District-1,
Int'l Assoc. Of Machinists and
Aerospace Workers, AFL-CIO
805 15th Street N.W., Suite 500
Washington, D.C. 20005
202-216-4457

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 6th day of October, 2011, the foregoing Brief for the Appellant has been served on counsel for the Defendants via this Court's Electronic Case Filing System (ECF).

Mark W Pennak
Mark.Pennak@usdoj.gov

Leonard Schaitman
Leonard.Schaitman@usdoj.gov

/s/ Stefan P. Sutich
Stefan P. Sutich
General Counsel
National Federation of
Federal Employees, FD-1,
IAMAW
805 15th Street NW, Suite
500
Washington, D.C. 2000
202-216-4457