**ORAL ARGUMENT SCHEDULED FOR JANUARY 23, 2012**

No. 11-5135

_____

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

NATIONAL FEDERATION OF FEDERAL EMPLOYEES – IAM,

*Plaintiff-Appellant*

*v.*

THOMAS J. VILSACK, SECRETARY,
UNITED STATES DEPARTMENT OF AGRICULTURE, *et. al.,*,

*Defendant-Appellee,*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

FINAL BRIEF FOR THE SECRETARY OF AGRICULTURE

_____

TONY WEST,
 *Assistant Attorney General*

LEONARD SCHAITMAN
 (202) 514-3441

MARK W. PENNAK
 (202) 514-1673
 *Attorneys*
 *Appellate Staff*
 *Civil Division, Room 7326 MAIN*
 *Department of Justice*
 *Washington, D.C. 20530*

NOVEMBER 2011

_____

_____

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

**A.      Parties and Amici:**

Plaintiff-appellant's statement is correct.  The National Federation of Federal Employees, FD-1, affiliated with the International Association of Machinists and Aerospace Workers (IAM), AFL-CIO ("NFFE") is the Appellant. NFFE was the Plaintiff in the District Court.  Thomas J. Vilsack, Secretary of Agriculture, and Thomas L. Tidwell, Chief of the United States Forest Service, in their official capacities, are the Appellees. They were the Defendants in the District Court.  No intervenors or amici appeared in the lower court proceedings.

**B.      Rulings Under Review:**

Plaintiff-appellant's statement is correct.  NFFE appeals the April 6, 2011 Memorandum Opinion and Order of the Honorable Beryl A. Howell of the U.S. District Court for the District of Columbia granting summary judgment to the Defendants.  That decision is reported at *National Federation of Federal Employees-IAM v. Vilsack*, 775 F. Supp. 2d 91 (D.D.C. 2011).  The parties have agreed to a deferred appendix under Circuit Rule 30(c).

**C.      Related Cases:**

Plaintiff-appellant's statement is correct.  This case has not previously been before this Court.  Counsel is unaware of any pending related cases.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES,
RULINGS, AND RELATED CASES.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

TABLE OF AUTHORITIES.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  v

GLOSSARY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ix

QUESTIONS PRESENTED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

STATUTES AND REGULATIONS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

STATEMENT OF JURISDICTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

     A.    Nature of the Case.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

     B.    The Statutory Scheme And The History Of Drug Abuse and Drug
            Testing At Job Corps Centers.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

          1.    The JCCCC program. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

          2.    Drug testing of JCCCC employees. . . . . . . . . . . . . . . . . . . . . .  8

     C.    The District Court's Decision  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

SUMMARY OF ARGUMENT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

ARGUMENT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

I.     THE SCOPE AND STANDARD OF REVIEW.. . . . . . . . . . . . . . . . . . . . .  19

II.     THE USDA DRUG TESTING PLAN IS FACIALLY CONSTITUTIONAL
        UNDER THE FOURTH AMENDMENT. . . . . . . . . . . . . . . . . . . . . . . 21

        A.     Fourth Amendment Facial Challenges Are Disfavored
               In The Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

        B.     The Drug Testing Implemented By The Secretary Is Facially
               Valid Under The Fourth Amendment.. . . . . . . . . . . . . . . . . . . . . 24

               1.     Supreme Court precedent. . . . . . . . . . . . . . . . . . . . . . . . . 24

               2.     Lower court precedent . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

               3.     The controlling inquiry under the balancing test. . . . . . . . . 29

        C.     The Regulations Are Facially Valid. . . . . . . . . . . . . . . . . . . . . . 32

               1.     The Job Corps employee's privacy interest
                      is diminished. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

               2.     The governmental interest served by random
                      testing is compelling. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

        D.     The Secretary Is Not Required To Limit Drug Testing To Particular
               Positions Where The Underlying Danger Sought To Be Avoided
               Encompasses All Positions At Job Corps Centers. . . . . . . . . . . . . 44

        E.     NFFE's Reliance On *Chandler* Is Without Merit. . . . . . . . . . . . . 49

III.    THE DISTRICT COURT DID NOT ERR IN DENYING PLAINTIFF'S
        MOTION FOR A PRELIMINARY INJUNCTION. . . . . . . . . . . . . . . . . . 54

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

STATUTORY ADDENDUM

# TABLE OF AUTHORITIES[*]

**Cases:**

*Advocates for Highway and Auto Safety v. Federal Motor Carrier Safety Admin.*, 492 F3d 1136 (D.C.Cir. 2005. . . . . . . . . . . . . . . . . . . . . 19

* *Aeronautical Repair Station Ass'n., Inc. v. FAA*, 494 F.3d 161 (D.C. Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 50-51

*American Federation of Government Employees, AFL-CIO v. Roberts*, 9 F.3d 1464 (9th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*American Federation of Government Employees v. Skinner*, 885 F.2d 884 (D.C.Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 27, 31

*Bell v. Wolfish*, 441 U.S. 520 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

* *BNSF Ry. Co. v. Dept. of Transp.* 566 F.3d 200 (D.C. Cir. 2009). 17, 22, 23, 28-32, 50,41

* *Board of Education v. Earls*, 536 U.S. 822 (2002). . . . . . . . . . . . 29, 39, 43, 49, 50

*Chandler v. Miller*, 520 U.S. 305 (1997),. . . . . . . . . . . . . . . . . . . . . . . . . 15, 49-53

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*City of Olmstead Falls v. FAA*, 292 F.3d 261 (D.C. Cir. 2002). . . . . . . . . . . . . . 20

*Crager v. Board of Education of Knott County*, 313 F. Supp. 2d 690 (E.D. Ky. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288 (D.C. Cir. 2009). . . . . . . . . . 55

---

[*] Authorities on which the Secretary principally relies are marked with asterisks.

*Geleta v. Gray*, 645 F.3d 408 (D.C. Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Greene V. Dalton,* 164 F.3d 671, 675 (D.C. Cir. 1999). . . . . . . . . . . . . . . . . . . . 11

*Griffin v. Wisconsin*, 483 U.S. 868 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

\* *Harmon v. Thornburgh*, 878 F.2d 484 (D.C. Cir. 1989). . . . . . . . . . . . . . . . 12, 42

*Hartness v. Bush,* 919 F.2d 170 (D.C. Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Katz v. Georgetown Univ.*, 246 F.3d 685 (D.C. Cir. 2001). . . . . . . . . . . . . . . . . 54

\* *Knox County Education Ass'n v. Knox County Board of Education*,
158 F.3d 361, 374-75 (6th Cir. 1998), *cert. denied,* 528 U.S. 812 (1999). . . .   39 40

*Lozowski v. Mineta*, 292 F.3d 840 (D.C.Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . 20

*Menkes v. Dept. of Homeland Sec.*, 637 F.3d 319 (D.C. Cir. 2011). . . . . . . . . . . . 21

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*National Federation of Federal Employees-IAM v. Vilsack*,
775 F.Supp.2d 91 (D.D.C. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*NAGE v. United States Army*, 30 FLRA 1083 (Jan. 27, 1988). . . . . . . . . . . . . . . 35

\* *NFFE v. Cheney*, 884 F.2d 603 (D.C. Cir.1989),
*cert. denied*, 493 U.S. 1056 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 29

\* *National Treasury Employees Union v. Von Raab*, 489 U.S. 656 (1989). . .   12, 24,
29,32, 33,37, 43, 50-52

*North America Freight Car Ass'n v. Surface Transp. Bd.*,
529 F.3d 1166 (D.C. Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*NTEU v. Yeutter*, 918 F.2d 968 (D.C. Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . 27

*PPL Mont., LLC v. STB*, 437 F.3d 1240 (D.C. Cir. 2006). . . . . . . . . . . . . . . . . . 20

*Public Citizen, Inc. v. FAA*, 988 F.2d 186 (D.C.Cir. 1993). . . . . . . . . . . . . . 20, 21

*Reno v. Flores*, 507 U.S. 292 (1993).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

\* *Samson v. California*, 547 U.S. 843 (2006). . . . . . . . . . . . . . 26, 29-31, 43, 48-49

*Sibron v. New York*, 392 U.S. 40 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

\* *Skinner v. Ry Labor Exec.'s Ass'n,* 487 U.S. 602 (1989).   12, 22-24, 29, 32, 49-52

*Smith, Bucklin & Associates, Inc. v. Sonntag*, 83 F.3d 476 (D.C. Cir. 1996).  . . . 55

\* *Stigile v. Clinton*, 110 F.3d 801 (D.C. Cir. 1997). . . . . . .   12, 17, 28, 36, 44-46, 50

*United States v. Mead Corp*., 533 U.S. 218 (2001).. . . . . . . . . . . . . . . . . . . . . 20, 43

\* *Vernonia Sch. Dist. v. Action,* 515 U.S. 646 (1995). . . .   12, 17, 25, 29, 31-33, 37,
39, 40, 48-52

*Warshak v. United States,* 532 F.3d 521 (6th Cir. 2008) . . . . . . . . . . . . . . . . . . . 22

**Statutes:**

\* Public Law No. 100-71, §503(a)(1)(A)(I). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

5 U.S.C. §706(2)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

5 U.S.C. §7106(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

\* 5 U.S.C. §7301 note, 101 Stat. 391 (July 11, 1987). . . . . . . . . . . . . . . . . . . . . . .  8

28 U.S.C. §1331. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

28 U.S.C. §1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

29 U.S.C. §2884. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

29 U.S.C. §2884(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

29 U.S.C. §§2881(a), 2884, 2888(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

29 U.S.C. §2892(b)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**Regulations:**

\* Mandatory Guidelines for Federal Workplace Drug Testing Programs,
   Department of Health and Human Services, 73 Fed. Reg: 71858 (2008),
   amended 75 Fed. Reg. 22809 (April 30, 2010). . . . . . . . . . . . . . . . . . . . .  9,12, 17,
                                                                                         36, 53

20 C.F.R. §670.540(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

20 C.F.R. §638.400(c), (d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

73 Fed. Reg. 71858 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**Other Authorities:**

Executive Order 12564, 51 FR 32889 (Sept. 15, 1986). . . . . . . . . . . . . . . . . . 8, 9

Job Corps Oversight, Hearings before the Senate Committee on Labor and
   Human Resources, 104th Congress, 1st Sess.  (January 18, and 19, 1995). . . . . 41

Report No. 104-118, Senate Committee on Labor and Human Resources,
   104th Congress, 1st Sess.  (July 24, 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . 41

# GLOSSARY

| | |
|---|---|
| JCCCC | Job Corps Civilian Conservation Centers |
| HHS Guidelines | Mandatory Guidelines for Federal Workplace Drug Testing Programs" issued by the Department of Health and Human Services, 73 Fed. Reg: 71858 (2008) |
| NFFE | The plaintiff-appellant, National Federation of Federal Employees |
| TDPs | Testing Designated Positions |
| Secretary | Secretary of the United States Department of Agriculture |

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

No. 11-5135

_____

NATIONAL FEDERATION OF FEDERAL EMPLOYEES – IAM,
*Plaintiff-Appellant*
*v.*

THOMAS J. VILSACK, SECRETARY,
UNITED STATES DEPARTMENT OF AGRICULTURE, *et. al.,,*
*Defendant-Appellee,*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

## QUESTIONS PRESENTED

1.  Whether the district court properly held that the Department of
Agriculture policy decision to impose random drug testing on U.S. Forest Service
("USFS") employees working with at-risk youth in remote, residential Job Corps
Civilian Conservation Centers was not facially unconstitutional under the Fourth
Amendment.

2.  Whether the district court properly denied preliminary injunctive relief to
plaintiff-appellant.

## STATUTES AND REGULATIONS

Relevant statutory and regulatory provisions are reproduced in the
accompanying statutory addendum.

The statement of jurisdiction in plaintiff-appellant's brief correctly sets forth the jurisdictional basis for this appeal.  The district court had jurisdiction over the case under 28 U.S.C. §1331.  The district court entered judgment in favor of defendant on April 6, 2011.  Plaintiff-appellant filed a notice of appeal on May 24, 2011.  This Court has jurisdiction under 28 U.S.C. §1291.

## STATEMENT OF THE CASE

**A.    Nature of the Case**

Plaintiff is the National Federation of Federal Employees-IAM ("NFFE"), representing employees at the United States Forest Service of the Department of Agriculture.  NFFE challenges random drug testing regulations issued by the Department of Agriculture for its U.S. Forest Service ("USFS") employees working at 28 residential Job Corps Civilian Conservation Centers ("JCCCC" or "Job Corps") at rural locations throughout the United States.  After a long delay caused by the NFFE's opposition, the Secretary's decision to apply random drug testing to JCCCC employees implements a long-standing Job Corps Zero Tolerance policy to address a recognized drug problem at Job Corps Centers.  The district court held, on the Secretary's motion for summary judgment, that random drug testing of these employees did not constitute a facial violation of the Fourth Amendment.  Accordingly, the district court denied NFFE's motion for a

preliminary injunction and entered judgment for the Secretary.  NFFE has

appealed.

### B.  The Statutory Scheme And The History Of Drug Abuse and Drug Testing At Job Corps Centers

### 1.    The JCCCC program

The Job Corps program provides intensive "education, vocational training, work experience, recreational activities, physical rehabilitation and development, and counseling" to enhance the responsibility, productivity, and employability of eligible persons between 16 and 24 years of age.  29 U.S.C. §§ 2881(a), 2884, 2888(a)(1).  To be eligible, an individual must be economically disadvantaged and must require "additional education, training, or intensive counseling and related assistance in order to secure and hold meaningful employment, participate successfully in regular school work, qualify for other suitable training programs, satisfy Armed Forces entry requirements, or qualify for a job where prior skill or training is a prerequisite."  20 C.F.R. §638.400(c), (d); see 29 U.S.C. §2884(a).

More specifically, these students are "(1) basic skills deficient; (2) a school dropout; (3) homeless, a runaway, or a foster child; (4) a parent; [or] (5) an individual who requires additional education, vocational training, or intensive counseling and related assistance, in order to participate successfully in regular schoolwork or to secure and hold employment."  29 U.S.C. §2884.  Many of these students are "from inner cities and were previously members of street gangs," and

the JCCCC program is their "last chance," providing "many students with an

opportunity to significantly change their lives." (Dawson Decl., ¶ 4)(JA 136).

The Job Corps Centers at issue in this case are within the United States

Forest Service and are operated by the Department of Agriculture pursuant to an

agreement between the Department of Agriculture and the Department of Labor.

(Slip op. at 3)(JA 17).  These Centers educate 6,200 students in rural areas located

in National Forests throughout the United States.  Some of these locations are in

highly isolated areas, far from any established medical facilities.   (Id. at 3)(JA 17).

For example, the Trapper Creek Center is 75 miles from the closest medical

facility; the Anaconda Center is 97 miles away from such facilities, while the Cass

Center is 137 miles away from any medical facility.  The students at these Centers

are there 24 hours a day, 7 days a week and are completely dependent on Center

staff for transportation and other needs.  (Id. 3-4)(JA17-18).

Job Corps enrollees are "at risk" individuals and such enrollees are

consequently required to submit to a drug test as a condition of enrollment.  29

U.S.C. §2892(b)(2); 20 C.F.R. §670.540(b) ("all students must be tested for drugs

as a condition of enrollment."); Def.'s Dawson Decl., ¶ 7 ("All students entering

the Job Corps program must submit to a urinalysis drug test.")(JA 137); see also

U.S. DOL Office of Job Corps, Policy and Requirements Handbook, §

6.11(R1)(c)(1) ("New and readmitted students shall be tested for drug use only

within 48 hours of arrival on center.").  Job Corps Centers strictly enforce a policy

- 4 -

of Zero Tolerance, requiring dismissal of an enrollee who commits an act of

violence, uses, sells or possess a controlled substance, abuses alcohol, or

otherwise participates in illegal or disruptive activity.

The facts are undisputed that about 25% of new enrollees test positive for

drug use at their initial test.  Dawson Decl., ¶ 7 (26% tested positive at all JCCs

nationally in 2004-05) (JA 137); Kopack Decl., ¶ 5 (23.2% tested positive at Cass

JCCCC in 2009-10)(JA 162-1630; Ryan Decl., ¶ 5 (approximately 15% of all new

enrollees test positive at Anaconda JCCCC) (JA 154-55); Guzik Decl., ¶ 5 (18%

tested positive at Trapper Creek JCCCC in 2009-10)(JA 145).  Enrollees are

always subject to suspicion-based testing at any time if a Job Corps employee

reports suspicious behavior and recommends testing.  Dawson Decl., ¶ 9 (JA 138);

Kopack Decl., ¶ 6 (JA 163); Ryan Decl., ¶ 6 (JA 155); Guzik Decl., ¶ 6 (in the

2009-10 program year, 8 out of approximately 224 enrollees, or 3.6%, at Trapper

Creek JCCCC tested positive upon suspicion-based testing) (JA 145).

Federal employees at Job Corps Centers are likewise strictly screened for

suitability.  While Job Corps employees occupy many types of positions, "all

JCCCC staff members undergo pre-employment background investigations, which

are 'more rigorous' than the background checks undertaken for most other

non-JCCCC USFS employees, and also undergo periodic background reinvestiga-

tions." Slip op. at 4 (JA 18), citing Dawson Decl., ¶ 12 (JA 138); Dawson Supp.

Decl., ¶ 5 (JA 170). Similarly, Job Corps employees "are subject to the

background check protocol that the USDA designed in 1993 for employees that

'supervise young people.'" (Id., citing Dawson Decl., ¶ 12 (all JCCCC employees

are subject to a "Child Care National Agency Check with Inquiries: Non

Sensitive/Low Risk," and some are subject to "Moderate Risk Background

Investigation: Moderate Risk/Public Trust") (JA 138-39). Every Job Corps

employee is responsible for (1) modeling appropriate behavior for students, (2)

mentoring students toward responsible behavior, and (3) monitoring student

behavior, including the possibility of drug use by a student. (Guzik Decl. at 5) (JA

139).

 Because of the isolated and residential aspects of Job Corps facilities, "all

employees are responsible for the safety of the JCCCC students." Slip op. at 5 (JA

19), citing Dawson Decl. at ¶¶ 13-16 (JA 139-140); Guzik Decl., ¶ 18 (JA 150);

Ryan Decl., ¶ 14 (JA 159); Kopack Decl., ¶ 18 (JA 167). Similarly, "[a]ll

employees are trained in CPR and First Aid within 90 days of employment, and

applicable regulations require staff members to hold driver's licenses so that they

can be available to transport students." (Id. at 5, citing USDA Dep't Regulation

No. 4430-792-2, Drug Free Workplace Program, Aug. 25, 2003 (hereinafter

"USDA Drug Testing Regulation"), at A-7 ("Each staff member *is required to possess a valid driver's license* to transport students in case of emergency, to and from work sites, etc.") (emphasis added) (JA 19);  Guzik Decl., ¶ 16 (JA 148-49); Ryan Decl., ¶ 12 (JA 157-58);  Kopack Decl., ¶ 16) (JA 166).  "[A]ll staff may be required to respond in an emergency situation and transport and care for students." (Id. citing  Dawson Decl., ¶¶ 14-16 (JA 139-40);  Guzik Decl., ¶¶ 17-19 (JA 149-50);  Ryan Decl., ¶¶ 13-15 (JA 158-59);  Kopack Decl., ¶¶ 17-19 (JA 166-67).

Thus, "[a]lthough some JCCCC employees rarely undertake such tasks, given the centers' remote locations and residential setting, all staff may be required to respond in an emergency situation and transport and care for students." Slip op. at 5 (JA 19), citing  Dawson Decl., ¶¶ 14-16 (JA 139-40);  Guzik Decl., ¶¶ 17-19 (JA 149-50);  Ryan Decl., ¶¶ 13-15 (JA 158-59);  Kopack Decl., ¶¶ 17-19 (JA 166-67).  In addition, "some employees teach students vocational skills, such as welding and electrical work, which require use of plasma cutters and welding arcs, activities that pose inherent risks to the safety of students and require a drug-free environment for both teachers and students."  Slip op. at 6 (JA 20, citing Guzik Decl., ¶¶ 20-22 (JA 167-68); Ryan Decl., ¶ 16 (JA 159); Kopack Decl., ¶ 20 (JA 167).

## 2.     Drug testing of JCCCC employees

Drug testing of federal employees is authorized under Pub. Law 100-71, codified at 5 U.S.C. §7301 note, 101 Stat. 391 (July 11, 1987), and Executive Order 12564, 51 FR 32889 (Sept. 15, 1986), reprinted in 5 U.S.C. §7301 note at 909-11 (1988), issued by President Reagan.  Under these provisions, each federal agency is required to "develop[] a plan for achieving a drug-free workplace in accordance with Executive Order Numbered 12564 and applicable provisions of law."  Public Law No. 100-71 §503(a)(1)(A)(I).  In particular, Executive Order 12564 "directed executive-branch agencies to establish mandatory programs to test employees in 'sensitive positions' for the use of illegal drugs." *American Federation of Government Employees, AFL-CIO v. Skinner,* 885 F.2d 884, 886 D.C. Cir. 1989).  The random drug-testing procedures followed by the USDA are those mandated by (1) Executive Order 12564; (2) the "Mandatory Guidelines for Federal Workplace Drug Testing Programs" issued by the Department of Health and Human Services (HHS), 73 Fed. Reg. 71858 (Nov. 25, 2008), amended 75 Fed. Reg. 22809 (April 30, 2010); (3) the "Model Plan for a Comprehensive Drug Free Workplace Program" developed by HHS; and (4) the "Guidance for Selection of Testing Designated Positions (TDPs)" issued by the Interagency Coordinating Group, which consists of the drug program coordinators from all federal agencies. (Nagel Decl. ¶3) (JA 176).

Pursuant to that authority, the Secretary issued the Plan for a Drug Free Workplace in 1988. That Plan did not, at that time, include JCCCC employees among those employees subject to random drug testing. (Slip op. at 7) (JA 21). However, in 1995, a Senate investigation uncovered drug problems at Job Corps Centers and Department of Labor instituted a zero toleration policy for Job Corps employees. (Slip op. at 7-8 (JA 21-22), citing Nagel Decl. , ¶¶ 17-18) (JA 179-80). That policy required that all Job Corps staff support and implement the Zero Tolerance policy and strictly prohibited the possession, distribution and use of drugs. (Id. at 8) (JA 22). Soon thereafter, in July 1996, all JCCCC staff positions were designated for random drug testing under USDA's drug-testing regulations. (Id.). NFFE, the plaintiff in this case, objected to the inclusion of all Job Corps employees as "testing designated positions" ("TDPs"). Due to opposition from the NFFE, the USDA delayed implementing drug testing for JCCCC staff at that time. (Nagel Decl., at ¶ 19) (JA 180). During that time period, at least eight JCCCC staff members have been disciplined for drug violations. (Dawson Decl. ¶ 17) (JA 140-41).

Since 1996, USDA has engaged in a series of discussions with the NFFE over the inclusion of these positions as testing positions. In 2007, the Forest Service pressed these negotiations more urgently in light of a "memorandum from

Office of National Drug Control Policy in the Executive Office of the President to all federal agencies, dated May 2007, requiring each agency to review its list of TDPs and certify the accuracy and appropriateness of the list.".  (Nagel Decl., ¶19) (JA 180).  Thereafter, on May 27, 2010, the Forest Service completed a collective bargaining agreement bargaining with NFFE to include JCCCC staff members as TDPs.  The effective date of that collective bargaining agreement was October 24, 2010.  (Id.).

### C.   The District Court's Decision

On October 13, 2010, NFFE filed its complaint in district court in this case and soon thereafter filed a motion for a preliminary injunction.  The Secretary filed a motion to dismiss and, in the alternative, a motion for summary judgment.  In a comprehensive, 34-page decision issued on April 4, 2011, the district court denied the motion to dismiss, denied plaintiff's motion for a preliminary injunction and granted the Secretary's motion for summary judgment.  (JA 15).  The court's opinion is reported at *National Federation of Federal Employees-IAM v. Vilsack*, 775 F.Supp.2d 91 (D.D.C. 2011).

The district court initially denied the government's motion to dismiss, finding that the complaint sufficiently stated a claim upon which relief can be granted.  (Slip op. at 13) (JA 27).  The court stated that the complaint stated a

"plausible claim that the regulations are overbroad, supported by sufficient factual assertions that many JCCCC employees are not in safety-sensitive positions similar in type to those already subject to the random drug testing regulation." (Id.). Turning then to the motion for summary judgment, the court held first that the material facts were undisputed. In particular, the court found that "the factual disputes noted by the plaintiff . . . are fairly insignificant and, in any event, not sufficiently material to bar summary judgment." (Slip op. at 14 n.3)(JA 28). As the court noted, in order to defeat a motion for summary judgment a party "must present specific facts that would enable a reasonable jury to find in its favor." Slip op. at 13-14, citing *Greene v. Dalton,* 164 F.3d 671, 675 (D.C. Cir. 1999) (JA 27-28).

Turning to the merits, the district court relied on *National Treasury Employees Union v. Von Raab*, 489 U.S. 656 (1989); *Skinner v. Ry Labor Exec.'s Ass'n.*, 487 U.S. 602 (1989); *Vernonia Sch. Dist. v. Action,* 515 U.S. 646 (1995); *Harmon v. Thornburgh*, 878 F.2d 484 (D.C. Cir. 1989), and *NFFE v. Cheney*, 884 F.2d 603 (D.C. Cir.1989), *cert. denied*, 493 U.S. 1056 (1990), as setting forth the controlling principles. (Slip op. at 14)(JA 28). Applying these cases, the court examined first the JCCCC employees' "reasonable expectation of privacy," finding that the intrusiveness of USDA drug testing policy was minimized by its

reliance on HHS Guidelines designed for that purpose (slip op. at 18)(JA 32) and that the operational realities of JCCCC employment further diminished these employees' reasonable expectations of privacy.  (Slip op. at 19) (JA 33).

The district court then examined the governmental interest and special needs served by the USDA policy, noting at the outset that the interest need not be "compelling," but rather need only be "'*important enough*'" to outweigh any expectation of privacy.  (Slip op. at 25, quoting *Vernonia*, 515 U.S. at 661) (emphasis in *Vernonia*)(JA 39).  Relying on  *Stigile v. Clinton*, 110 F.3d 801 (D.C. Cir. 1997), the court ruled that while there must be a nexus between the employees' duties and the risk addressed by the drug testing, that nexus is established in circumstances where "'a duty which places the employee in a position to render harm can give rise to the nexus even when the feared act by the employee would not itself be a normal part of that duty.'"  (Slip op. at 25, quoting *Stigile*, 878 F.2d at 805)(JA 39).

The court then ruled that the government "has a compelling interest in ensuring that all employees are drug-free for at least three reasons."  (Slip op. at 26)(JA 40).  Those three reasons were (1) that these employees enforced the USDA's Zero Tolerance policy at Job Corps Centers and that this Zero Tolerance policy was compelling in the Job Corps context (slip op. at 26-27)(JA 40-41); (2)

that these employees "have a unique 'role model effect' on students" because their proximity to these residential students meant that these employees have "special positions of influence and control over resident students already susceptible to drug abuse" (slip op. at 28)(JA 42); and (3) "[d]rug use by any JCCCC employee would pose risks of potential access to drugs and defeat the purpose of the program of maintaining a drug-free environment." (Slip op. at 29)(JA 43). The court also found that the government had an interest in "ensuring safety" at the Job Corps centers (slip op. at 29)(JA 43), finding that "the prospect that emergency situations could arise that would require assistance even from employees whose designated duty limits interaction with students, is quite real given that JCCCC locations are located in remote parts of the country." (Slip op. at 31)(JA 45).

The district court found unavailing NFFE's argument that the government's interest was undercut because the policy did not apply to private, non-federal workers at JCCCC locations. (Slip op. at 31-32)(JA45-46). Relying on *Stigile*, the court reasoned that "the government need not wait to address a problem until it is able to address all contributing factors of the problem." Slip op. at 32, citing *Stigile*, 110 F.3d at 807 (JA 46). The court then concluded that "the government has a compelling interest in testing these employees to ensure that they do not compromise the Jobs Corps' overall educational program and do not put students

at risk." (Id.). The court held that the rationale for the testing "overrides the employees' expectation of privacy, which is already diminished considering the nature of their employment and the regulations already imposed upon them." (Slip op. at 33)(JA 47).

Having ruled that the government was entitled to summary judgment, the court then denied plaintiff's motion for a preliminary injunction. Noting that a plaintiff must show a likelihood of prevailing on the merits in order to be entitled to a preliminary injunction, the court ruled that because the USDA random drug testing policy did not violate the Fourth Amendment, plaintiff "cannot demonstrate a likelihood of success on the merits." (Slip op. at 34)(JA 48). NFFE thereafter perfected this appeal.

## SUMMARY OF ARGUMENT

1. The district court did not err in granting summary judgment to the Secretary in this case. The NFFE's suit is a facial attack on the Secretary's testing policy and, as such, must be rejected if there are any circumstances in which the policy can be sustained. Thus, for example, if the Policy can be constitutionally implemented at the Trapper Creek Job Corps Center in the Montana wilderness, then plaintiff's facial attack must fail. None of the material facts are in reasonable dispute as all the "reasonable inferences" sought by plaintiff are only material

under a legal theory that the district court properly rejected. In holding for the Secretary, the district court articulated and applied the correct "balancing test" set forth in controlling Supreme Court and Circuit precedent. Plaintiff's contentions to the contrary, including its heavy reliance on *Chandler v. Miller*, 520 U.S. 305 (1997), are without merit.

The court properly held that the legitimate privacy interests of Job Corps employees were diminished by the operational realities associated with their positions at Job Corps Centers. These operational realities include a detailed investigation into the background of each employee; a background check that goes well beyond that normally associated with federal employment. These operational realities also involve "at-risk" enrollees, a history of drug problems at Centers, a remote residential setting, and a shared responsibility for safeguarding the safety of enrollees at these sometimes very remote facilities as well as a common duty to model, implement and enforce a strict Zero Tolerance drug policy.

There is nothing new about the Secretary's decision to impose random drug testing for Jobs Corps employees. Faced with a serious and Congressionally recognized drug problem at Job Corps Centers, the Secretary has sought since 1996 to implement random drug testing for Job Corps positions. Over NFFE's opposition, such drug testing is now incorporated in the collective bargaining

agreement with the NFFE and imposed as part of the Secretary's Plan for a Drug Free Work Place.  All NFFE represented Job Corps employees either knew or should have known that the Secretary has intended for years to implement random testing for these positions.  Nothing in this policy should have come as a surprise to these employees.

The district court also properly applied controlling Circuit precedent in ruling that the "harm to be avoided" served by the drug testing policy encompassed all Jobs Corps employees subject to random testing.  Regardless of their individual jobs, all Jobs Corps personnel at these residential job sites are required to hold driver's licenses, to be trained and certified in CPR and first aid and be ready to react in emergencies to safeguard the health and welfare of dependent Job Corps enrollees.  These Centers may, because of their remoteness, present unique safety and emergency situations, such as forest fires, requiring the unimpaired cooperation  and response of all Center employees.  Importantly, all these employees, regardless of their other duties, are charged with modeling, implementing and enforcing a rigorous Zero Tolerance policy against drug use and possession at these Centers.

The district court did not err in holding that the government's interest at issue here was sufficient to outweigh the intrusion on the privacy interests of these

- 16 -

employees. While these employees may have a privacy interest implicated by drug testing, this random drug testing program is in compliance with HHS Guidelines, which ensure that the random testing is minimally intrusive. This Court has recognized that this sort of random testing is "hardly onerous." *BNSF Ry. Co. v. Dept. of Transp*. 566 F.3d 200, 207 (D.C. Cir. 2009). By contrast, the Supreme Court emphasized in *Vernonia School District v. Acton*, 515 U.S. 646, 661 (1995), that the government's interest need not be compelling; rather it need only be "*important enough*" to outweigh the intrusion on the proffered privacy interest.

The district court correctly applied these teachings to hold that the government's interest here was not only "important enough," it was truly compelling. The Job Corps program run by the Department of Agriculture simply cannot serve its objectives or be expected to function as designed if its employees use illegal drugs. Such use is fundamentally inconsistent with the ability of these employees to discharge their shared responsibility to safeguard the welfare of resident, "at-risk" enrollees and to carry out the Secretary's strict Zero Tolerance policy. The government's interest in minimizing that serious risk to the Job Corps program and its interest in ensuring the safety of Job Corps resident enrollees outweighs any intrusion into the already diminished expectation of privacy of these employees.

2. The district court did not err in denying NFFE's motion for a preliminary injunction. Obviously, NFFE cannot satisfy the requirement of showing a serious likelihood of success on the merits if the district court was correct in holding that the random drug testing did not violate the Fourth Amendment. Summary judgment for the Secretary thus precludes preliminary injunctive relief in favor of the NFFE.

In any event, the NFFE errs in urging this Court to order the issuance of a preliminary injunction. Application of the familiar four-part test for the issuance of preliminary relief is, in important part, a matter of discretion vested with the district court. The district court's determination is thus reviewed only for abuse of discretion, as the NFFE concedes. Yet, because the district court ruled that plaintiff did not show any serious likelihood of success on the merits, the district court never considered the other three factors that plaintiff must show for preliminary relief. Thus, even assuming *arguendo* that the district court erred in granting summary judgment for the Secretary, this Court should, at most, simply remand for further proceedings.

## ARGUMENT

## I.     THE SCOPE AND STANDARD OF REVIEW

NFFE's suit was brought under the APA.  Under the APA, 5 U.S.C. §706(2)(A), a plaintiff "has the burden of showing that the agency action was "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  *Advocates for Highway and Auto Safety v. Federal Motor Carrier Safety Admin.*, 492 F3d 1136, 1144-45 (D.C.Cir. 2005), quoting 5 U.S.C. §706(2)(A).  Under this standard, agency action "will be found arbitrary 'if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to difference in view or the product of agency expertise.'"  (*Id.*), quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  See also *Lozowski v. Mineta*, 292 F.3d 840, 844 (D.C.Cir. 2002).

The APA standard of review is applied with the "'utmost deference in view of administrative expertise.'"  *Public Citizen, Inc. v. FAA*, 988 F.2d 186, 196-97 (D.C. Cir. 1993), quoting *Pillai v. Civil Aeronautics Bd.*, 485 F.2d 1018, 1027 (D.C. Cir. 1973).  See also *North America Freight Car Ass'n v. Surface Transp.*

*Bd.*, 529 F.3d 1166, 1170-71 (D.C. Cir. 2008); *PPL Mont., LLC v. STB*, 437 F.3d 1240, 1244-45 (D.C. Cir. 2006). *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), holds that the Court must give deference to the federal agency's implementation of a statutory scheme where Congress has delegated that authority to the agency. See *City of Olmstead Falls v. FAA*, 292 F.3d 261, 269 (D.C. Cir. 2002); *United States v. Mead Corp*., 533 U.S. 218, 226-27 (2001).

These principles apply here. The drug testing policy implemented by the Secretary is agency action subject to review under the APA. Whether the district court was ultimately correct in granting summary judgment is, of course, a question of law reviewed by this Court *de novo*. See, e.g., *Geleta v. Gray*, 645 F.3d 408, 410 (D.C. Cir. 2011) ("We review a grant of summary judgment de novo, drawing all reasonable inferences from the evidence in the light most favorable to the nonmoving party."). However, in undertaking that review, the Court must still accord the agency appropriate deference on statutory questions and give due deference on any matters involving agency discretion or expertise. See, e.g., *Menkes v. Dept. of Homeland Sec*., 637 F.3d 319, 329 (D.C. Cir. 2011).

In particular, as detailed below, in deciding the Fourth Amendment legal question, the Court engages in a balancing test in which the agency's assessment

of the harm sought to be avoided is balanced against the intrusion on the plaintiff's

alleged privacy interest.  In undertaking that balancing task, the Court should

accord "utmost deference" to the USDA's "administrative expertise" concerning

the nature of the Jobs Corps program, the extent of any drug problem faced by the

program, and how the needs of the program would be served and furthered by the

challenged random drug testing.  *Public Citizen*, 988 F.2d 196-97.

## II.     THE USDA DRUG TESTING PLAN IS FACIALLY CONSTITUTIONAL UNDER THE FOURTH AMENDMENT

### A.     Fourth Amendment Facial Challenges Are Disfavored In The Law

It is beyond cavil that NFFE's suit and this appeal present a facial Fourth

Amendment challenge to the Secretary's decision to include JCCCC employees as

Testing Designated Positions.  Stated differently, the case does not present any "as

applied" challenge to a particular employee's drug test.  Accordingly, the usual

constraints associated with facial challenges fully apply to this case.  Specifically,

facial challenges are viewed with disfavor.  See, e.g., *Sibron v. New York*, 392

U.S. 40, 59 (1968) (refusing to address the facial validity of New York's "stop and

frisk" statute under the Fourth Amendment, stating that "[t]he constitutional

validity of a warrantless search is pre-eminently the sort of question which can

only be decided in the concrete factual context of the individual case."); *Warshak*

- 21 -

*v. United States,* 532 F.3d 521, 528 (6th Cir. 2008) (en banc) ("the federal courts

do not lightly uphold [Fourth Amendment] facial challenges").

More importantly, in order to prevail in a facial challenge, the plaintiff must

show that "'no set of circumstances exists under which the [regulation] would be

valid.'" *Reno v. Flores*, 507 U.S. 292, 301 (1993) (citations omitted). *Skinner v.*

*Railway Labor Executives' Ass'n*., 489 U.S. 602 (1989), recognized that this rule

applies to Fourth Amendment facial challenges to drug testing regulations,

holding that because plaintiffs there had challenged "the administrative scheme on

its face," the issue was "whether the tests contemplated by the regulations can

*ever* be conducted." (489 U.S. at 632 n.10) (emphasis the Court's). This Court

recently applied the same rule to reject a facial challenge to a drug testing rule in

*BNSF Ry. Co. v. Dept. of Transp*. 566 F.3d 200, 208-09 (D.C. Cir. 2009)

("Because petitioners bring a facial challenge, we consider only 'whether the tests

contemplated by the regulations can ever be conducted,'" quoting *Skinner*, 489

U.S. at 632 n.10).

These principles mean, in this case, that plaintiff's facial attack must be

rejected if the USDA drug testing plan could be constitutionally applied to the

covered employees at any Job Corps Center anywhere in the United States. In

other words, if the random drug testing program can be constitutionally applied at

the Trapper Creek Center deep in the Bitterroot National Forest in the wilds of

Montana,[1] then the NFFE's facial challenge must fail in its entirety.  If the NFFE

believes that a particular employee at a particular Center has been wrongfully

subjected to random drug testing, then the NFFE may only bring an "as applied"

challenge as to that employee.  See *BNSF*, 566 F.3d at 209 ("We thus express no

view on . . . the merits of any as-applied challenge to this rule").

### B.    The Drug Testing Implemented By The Secretary Is Facially Valid Under The Fourth Amendment.

#### 1.    Supreme Court precedent

The leading cases are *Skinner* and *Von Raab*.  In *Skinner*, the Court upheld

against Fourth Amendment challenge the regulations issued by the Federal

Railroad Administration requiring mandatory drug testing of rail employees in

safety-sensitive positions.  Noting that the "expectations of privacy of covered

employees are diminished by reason of their participation in an industry that is

regulated pervasively to ensure safety," the Court balanced the "diminished

interest in bodily security" of such employees against the "compelling" interest of

---

[1] See the Trapper Creek, Montana Jobs Corps website at
http://trappercreek.jobcorps.gov/about.aspx.  The Trapper Creek site is in the
Bitterroot National Forest in Montana, some 75 miles from the nearest medical
facility.  See Slip op. at 3-4.

the Government in protecting the public from drug impaired employees who

"discharge duties fraught with such risks of injury to others that even a momentary

lapse of attention can have disastrous consequences." (489 U.S. at 628). The

Court noted that such "employees . . . can cause great human loss before any signs

of impairment become noticeable to supervisors or others." (*Id*.). The Court

applied the same balancing test in *Von Raab*, decided at the same time as *Skinner*,

to sustain, against a Fourth Amendment challenge, drug testing of Custom Service

officers, finding that armed Customs Service employees "have a diminished

expectation of privacy in respect to the intrusion occasioned by a urine test."

More recently, in *Vernonia School District v. Acton*, 515 U.S. 646 (1995),

the Supreme Court employed the same balancing test to sustain a student athlete

drug testing program in which an observer would watch the student urinate. (515

U.S. at 650). The Court made clear that the controlling inquiry was *not* whether

the governmental interest was "compelling," but whether "the interest appears

'*important enough*' to justify the particular search at hand, in light of other factors

that show the search to be relatively intrusive upon a genuine expectation of

privacy." (515 U.S. at 661) (emphasis the Court's). The Court also disavowed

any notion that the search had to be the least intrusive method, holding that "[w]e

have repeatedly refused to declare that only the 'least intrusive' search practicable

can be reasonable under the Fourth Amendment." (*Id*. at 663). The Court stressed

as well that the privacy interest assessment is an objective inquiry and thus must

be of the sort "that society recognizes as 'legitimate.'" (515 U.S. at 654). What

qualifies as "legitimate," the Court explained, "varies, of course, with context."

(*Id*.). *Vernonia* was followed thereafter by *Board of Education v. Earls*, 536 U.S.

822 (2002), in which the Court sustained a school policy requiring all students

who participated in competitive extracurricular activities to submit to drug testing

without individualized suspicion. The Court found that such testing was

constitutional as it was in furtherance of the school's "important interest in

detecting and preventing drug use among its students." ( 536 U.S. at 825).

More recently, in *Samson v. California*, 547 U.S. 843, 846 (2006), the Court

sustained a California statute that subjected parolees to "search or seizure by a

parole officer or other peace officer at any time of the day or night, with or without

a search warrant and with or without cause," as a condition of parole. The Fourth

Amendment reasonableness of this statute required an assessment of the privacy

interest versus "'the degree to which it [the search] is needed for the promotion of

legitimate governmental interests.'" (547 U.S. at 848). The parolee's expectation

of privacy was "severely diminished" by virtue of "their status alone," concluding

that the parolee "did not have an expectation of privacy that society would

recognize as legitimate." (547 U.S. at 852). In contrast, the state's interest was "substantial" because of the risk of parolee "recidivism." (*Id*. at 851-54). The Court expressly rejected the argument that individualized, reasonable suspicion was required, holding that such requirement "would give parolees greater opportunity to anticipate searches and conceal criminality." (*Id*. at 854).

### 2.     Lower court precedent

This Court has also strictly followed a balancing test in the wake of *Skinner* and *Von Raab*. As explained in *American Federation of Government Employees v. Skinner,* 885 F.2d 884, 889 (D.C.Cir. 1989), the Court must "balance the individual[s'] privacy expectations against the Government's interest to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context." (885 F.2d at 889). The Court explained, "[i]f a careful balancing of interests suggests that the public interest would be best served by requiring a standard of reasonableness short of particularized suspicion, *we should not hesitate to adopt that standard*." (*Id*.)(emphasis added). Applying that standard, this Court sustained the constitutionality of DOT's regulations mandating different levels of drug testing for DOT employees.

This Court has applied this balancing test in a wide variety of situations to sustain drug testing requirements. In *NFFE v. Cheney*, 884 F.2d 603 (D.C.

Cir.1989), *cert. denied*, 493 U.S. 1056 (1990), the Court sustained random drug testing of civilian employees who occupied positions in aviation, police and guard, and direct service staff who were drug counselors.  Similarly, in *NTEU v. Yeutter*, 918 F.2d 968, 975 (D.C. Cir. 1990), this Court sustained random drug testing for governmental operators of motor vehicles.  In *Stigile v. Clinton*, 110 F.3d 801 (D.C. Cir. 1997), this Court ruled that the government's interest in protecting the President and Vice President justified random drug testing of all employees who merely held permanent passes to the Old Executive Office Building, regardless of their individual duties or positions.  In *Aeronautical Repair Station Ass'n., Inc. v. FAA*, 494 F.3d 161, 166 (D.C. Cir. 2007), this Court sustained mandatory random testing for all employees of contractors and subcontractors at any tier who performed safety-related functions for air carriers.

Most recently, this Court sustained a highly intrusive, direct observation drug testing regulation in *BNSF Ry. Co. v. Dept. of Transp*. 566 F.3d 200 (D.C. Cir. 2009).  In that case, regulations issued by the Department of Transportation required that safety sensitive private transportation industry employees, who had failed a prior drug test, were subject to full and direct observation drug testing in which the genitalia of the employee were briefly exposed to observation during the

testing process. This Court balanced the government's interest in testing with what the Court called the "extremely strong interests in freedom from searches as intrusive as direct observation urine testing." (566 F.3d at 206). The Court nonetheless concluded that the challenged regulations were facially valid under the Fourth Amendment in the return-to-duty context for employees who had previously failed a drug test. (Id. at 208).

### 3.    The controlling inquiry under the balancing test

Several controlling principles emerge from these cases. *Vernonia , Earls* and *Samson* establish that the privacy interest must be legitimate and that inquiry turns on the context and the relationship in which the privacy interest is asserted. See also *Skinner*, 459 U.S. at 628 ("justifiable expectations of privacy"). *Vernonia* squarely holds that the asserted government interest need not be "compelling" but rather only "*important enough* to justify the particular search at hand." (515 U.S. 661) (emphasis the Court's).

The case law also makes clear that no 'individualized" suspicion is required where that requirement would be impractical. (515 U.S. at 653-54). Similarly, *Skinner, Von Raab*, *Vernonia*, *Earls* and *Samson* all recognize that deterrence alone is an important and sufficient governmental interest. In no case did the

Court require the the government to employ the least intrusive method of testing. See also *BNSF*, 566 F.3d at 206 ("there is no per se requirement that the government use the least intrusive practicable means"); *National Fed'n of Fed. Employees v. Cheney*, 884 F.2d 603, 610 (D.C.Cir. 1989), *cert. denied.*, 493 U.S. 1056 (1990) (rejecting the argument that the government must use the least intrusive method).

The common thread of the Fourth Amendment balancing test that emerges from these cases is that the court assesses the intrusion into the legitimate privacy interest and balances that intrusion against the asserted governmental interest. For example, in citing to *Samson*, the Secretary is, of course, not suggesting that Job Corps employees can be likened in any way to the criminal parolees. Rather, *Samson* demonstrates that the balancing test would sustain a extremely intrusive search where the privacy interest was substantially diminished. Similarly, in *BNSF,* an "extremely invasive" direct observation drug testing for return-to-duty employees was nonetheless found to be constitutional where the employees had "less of a legitimate interest in resisting a search." *BNSF*, 566 F.3d at 207-208. The point is that the balancing testing test is necessarily a multi-faceted, case-by-case inquiry. This test cannot be reduced to simplistic rules, such as proffered by

plaintiff (Br. at 36) in contending that no random testing is ever constitutionally

permissible unless justified position-by-position.  See, e.g., *BNSF*, 566 F.3d at 207

(noting that "balancing the individuals' interest with the government's . . . is

necessarily imprecise.")

     Here, Job Corps employees certainly have a greater reasonable expectation

of privacy than that possessed by the *Samson* criminal parolees, or by the return-

to-duty transportation employees involved in *BNSF*.  These Jobs Corps employees

have not been convicted of a crime (*Samson*) or already failed a drug test (*BNSF*).

But then the random drug testing program for Job Corps employees at issue here is

also dramatically less intrusive than the warrantless, day or night, criminal

searches and seizures permitted in *Samson*,[2] or the "extremely invasive" direct

observation testing nonetheless sustained in *BNSF*.  In each case, the balancing

test requires the court to balance the extent of the intrusion on a "legitimate"

privacy interest against the government interest sought to be served by the testing

in order to determine whether the governmental interest is "important enough" to

---

   [2] As this Court noted in *American Federation of Government Employees, AFL-CIO v. Skinner*, 885 F.2d 884, 889 (D.C. Cir. 1989), "non-consensual disclosure of test results to police authorities is proscribed both by regulation and statute.").  (Citing HHS Reg. § 2.8; Pub.L. No. 100–71, §503(e), 101 Stat. 471 (1987)).

outweigh the type of intrusion presented. *Vernonia*, 515 U.S. at 661. See *BNSF*, 566 F.3d at 207-08 (contrasting "extremely invasive" direct observation testing with the "perfectly legitimate-and hardly onerous" testing applicable to all safety-sensitive transportation industry employees).

The district court applied these principles in articulating the balancing test in this case. The district court ruled that "[u]nder the balancing test applied in [Supreme Court cases] *Skinner* and *Von Raab*, a drug test in the employment context is 'reasonable' and therefore constitutional if, in light of all surrounding circumstances, the governmental interest it serves outweighs the intrusion on individual privacy interests it occasions." Slip op. at 15, quoting *Hartness v. Bush,* 919 F.2d 170, 177 (D.C. Cir. 1990). That is a correct statement of the law. As set forth below, the district court did not err in its application of that test to the "hardly onerous" type of testing involved here. *BNSF*, 566 F.3d at 207.

### C.    The Regulations Are Facially Valid

#### 1.    The Job Corps employee's privacy interest is diminished

As *Vernonia* holds, the "first factor to be considered is the nature of the privacy interest upon which the search here at issue intrudes." (515 U.S. at 654). Such privacy interests must be objectively reasonable and recognized by society as

"legitimate." (*Id*.). Legitimacy depends on "context," and the "legal relationship" between the parties. (*Id*.). A "supervisory relationship" thus "justifies 'a degree of impingement upon . . . privacy that would not be constitutional if applied to the public at large.'" (*Id*.), quoting *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987). See also *Samson*, 547 U.S. at 852 (holding that the parolee's expectation of privacy was not "legitimate").

It is well established that privacy "expectations" may be diminished by the "'operational realities of the workplace'" and thus "render entirely reasonable certain work-related intrusions by supervisors and co-workers that might be viewed as unreasonable in other contexts." *Von Raab*, 489 U.S. at 671. Here, the unique "operational realities" associated with Job Corps employment also serve to minimize any expectation of privacy.

First, as the district court stated, "these employees work with at-risk youth in residential settings and are responsible for the students' safety and welfare." (Slip op. at 20)(JA 34). This point is important, for these are residential settings in often quite remote settings. A number of these employees even live at some Centers, rather than commuting home each day after work. (Dawson Suppl. Decl. ¶ 4) (JA 170). Second, these "employees must help maintain and enforce a Zero

Tolerance drug environment for the students, and this policy requires no drug use among either the students or the staff, no matter the position." (Id.). That factor is also important. Every federal employee is enjoined against the use of illegal drugs by President Reagan's Executive Order, but every Job Corps employee is uniquely also required, as part of his or her job, to enforce a Zero Tolerance policy that applies not only to themselves but also to "at risk" students who often come from an inner city drug culture. As a matter of common sense, an employee who uses drugs cannot be counted on to enforce a Zero Tolerance policy for students.[3]

Third, "the JCCCCs are located in rural or remote areas and employees must therefore be able to drive students or staff to services located elsewhere, including in emergency situations." (Id.). It is undisputed that all these employees are required to possess a driver's license for the simple reason that all such employees may be required to drive in an emergency situation, regardless of their usual duties. As noted, many of these Centers are located in very remote locations in National Forests. At least one such center had to be evacuated because of a forest

---

[3] "Common sense" is no less available in the drug testing context than it is in other contexts. See *Von Raab*, 489 U.S. at 666 ("requiring the Government to procure a warrant for every work-related intrusion 'would conflict with 'the common-sense realization that government offices could not function if every employment decision became a constitutional matter.'") (citations omitted).

fire.  See, e.g., Guzik Decl., ¶ 18 ("In case of a need to evacuate the Center, all

employees and all available vehicles would have to be used to evacuate the

students quickly. . . .This Center was, in fact, evacuated in 2000 because of forest

fires.")(JA 150).  A drug impaired employee is not equipped to drive himself or

students safely in an emergency.  Because emergencies are, by definition,

unforeseeable and unknown in advance, all these employees, regardless of

position, must be prepared at all times to act in response to an emergency.

　　　　Fourth, these employees "have voluntarily submitted to rigorous

background checks before employment and undergo periodic re-investigations."

(Slip op. at 20)(JA 34).  Such background investigations are, in themselves, highly

intrusive and require that the employee reveal personal details and prior conduct

beyond that usually associated with employment.  By consenting to such back-

ground investigations, Job Corps employees are placed on notice that the position

that they occupy is one that involves some  sacrifice of personal privacy.  Indeed,

as the district court noted, these "employees have been on notice of testing since

1996, when the USDA first designated them for testing; and the new NFFE-USDA

Collective Bargaining Agreement provided further notice of impending

drug-testing provisions." (Id.).[4]  Given that the Secretary has sought to implement

drug testing for Job Corps employees since 1996, it is fair to say that the vast

majority of Job Corps employees were hired for these positions knowing that the

Secretary intended to require random drug testing for these jobs.  Significantly, the

NFFE does not assert that these employees had any actual reliance interest at stake

in this case.[5]

Last, but not least, the random testing to which the NFFE objects is

designed to be minimally intrusive.  This drug testing is conducted fully in accord

with HHS Guidelines that are designed to minimize intrusion into any expectation

of privacy.  (Slip op. at 17)(JA 31).[6]  See *Stigile v. Clinton*, 110 F.3d 801, 804

---

[4] As the district court noted (slip op. at 24 n. 9)(JA 38), the decision to
pursue drug testing resides exclusively with management as it is considered to be
an internal security practice under 5 U.S.C. §7106(a)(1).  See *NAGE v. United
States Army*, 30 FLRA 1083 (Jan. 27, 1988).

[5] NFFE asserts that employees did not have "actual notice" of the policy
until September 2010.  (Br. at 7-8).  However, NFFE does not dispute that it has
been a party to discussions about this proposed policy for years prior to that date
or that it was implemented in the parties' collective bargaining agreement.  In
context, it defies common sense to believe that the employees represented by
NFFE were utterly unaware of the Secretary's intent to impose drug testing until
September 2010.

[6] The current HHS Mandatory Guidelines for Federal Workplace Drug
Testing Programs, 73 Fed. Reg. 71,858 (2008), include provisions to protect
(continued...)

- 35 -

(D.C. Cir. 1997) ("The HHS regulations that govern the EOP's testing minimize the intrusion into [an individual's privacy] interest") (citing *Von Raab*, 489 U.S. at 672 n.2).  Importantly, the HHS testing procedures and methods are long-standing and time-tested.  This degree of accuracy both guarantees the integrity of the program and protects employees from the risk of "false positives" and inaccurate results.  The NFFE does not assert here that any of the testing procedures are invalid or contrary to HHS procedures.

## 2. The governmental interest served by random testing is compelling

In contrast to the diminished expectation of privacy possessed by JCCCC employees the governmental interest present in this case is, at the very least,

---

[6](...continued)
employee privacy, the integrity of urine specimens, and the validity of test results. Except under specific circumstances set forth in the Guidelines, the employee is allowed to provide a specimen in an enclosed stall or a single-person restroom, and the collector must give the employee visual privacy while providing the specimen.  See HHS Mandatory Guidelines, §§ 8.1(c), 8.8, 73 Fed. Reg. at 71,884, 71,886.  Except under the circumstances set forth, neither the collector nor any other person may enter the room with the employee where the specimen is provided.  Id. § 8.4(a)(1), 73 Fed. Reg. at 71,884.  Each specimen that tests positive for drug use must be subject to a confirmatory second test using a different scientific method, and a positive result is reported only if the confirmatory test is also positive.  Id. §§ 11.13, 11.19(b), (c), 73 Fed. Reg. at 71,893, 71,894.  A medical review officer (a specially trained physician) must review each positive laboratory result for any legitimate medical explanation other than drug use.  Id. §§ 13.1, 13.3, 73 Fed. Reg. at 71,899, 71,900.  NFFE disputes none of this.

"*important enough*." *Vernonia*, 515 U.S. at 661) (emphasis the Court's). As the district court stated, "given the goals of the JCCCC program, the nature of JCCCC employees' responsibilities and the context in which they work, these employees have a diminished expectation of privacy, and this privacy interest is overridden by the government's interest in preventing illegal drug use at JCCCCs by both students and staff." (Slip op. at 16)(JA 30).

The district court's ruling was correct. For these students, the entire point of a Job Corps enrollment could be negated by the presence and use of drugs on site, whether possessed or used by other students or by federal employees. Drugs are strictly prohibited by the Zero Tolerance policy for students for obvious reasons. For many of these "at risk" individuals, drugs are the very reason that they otherwise been unable to function in society. Literally, the Job Corps enrollment may be these students' best and last chance at escaping the dysfunctional environment that drugs create. Drug use by a staff person at a residential facility like a Job Corps Center could become known by these students and thus serve to fatally undermine the Zero Tolerance policy. See Dawson Decl. ¶13 ("The students very quickly notice when staff behavior is inconsistent with the high standards to which the students are held.") (JA 139). Such a drug-using

employee is also far less likely to report knowledge or suspicion of a student's drug use and could even serve as a conduit for drugs in these remote settings.

Moreover, a drug impaired employee is not only a bad example for at-risk students, but may be physically incapable of safely responding to emergencies, especially at these remote, residential sites where outside assistance is many miles away. Drug use by employees thus potentially threatens the physical safety of every student at these remote sites, not only because drug use itself is dangerous, but because a drug using employee is necessarily impaired in his or her ability to function in emergencies. That situation would be intolerable.

This sort of supervisory and care taking responsibility is similar to other situations in which random drug testing has been sustained. In *Vernonia*, for example, the Court found it important that local government had "responsibilities, under a public school system, as guardian and tutor of children entrusted to its care." *Vernonia*, 515 U.S. at 665. In *Earls*, the Court found the education context to be a powerful factor in sustaining random testing of students engaged in extracurricular activities, noting that "the nationwide drug epidemic makes the war against drugs a pressing concern in every school." (536 U.S. at 834).

While *Vernonia* and *Earls* involved drug testing of students, the same point applies equally to the testing of persons charged with overseeing the activities of

dependent persons placed in their care, especially where drug usage by such dependent individuals is a concern.  For example, in *Knox County Education Ass'n v. Knox County Board of Education*, 158 F.3d 361, 374-75 (6th Cir. 1998), *cert. denied,* 528 U.S. 812 (1999), the Sixth  Circuit rejected a challenge to applicant, transfer, and promotion testing of principals, assistant principals, teachers, teacher aides, school secretaries, and bus drivers, recognizing the "community's interest in reasonably insuring that those who are entrusted with the care of our children will not be inclined to influence children – either directly or by example – in the direction of illegal and dangerous activities . . . ."[7]  Similarly, in *American Federation of Government Employees, AFL-CIO v. Roberts*, 9 F.3d 1464, 1467 (9th Cir. 1993), the Ninth Circuit sustained drug testing for Bureau of Prison employees where drug smuggling was a concern and where "detection of the use of drugs will ensure a desirable level of alertness for all correctional officers; for all are charged with responsibility for security while at work within the prison." The District Court correctly relied on these principles in this case.  See Slip op. at 28, 31 (citing *Knox* and *Vernonia*) (JA 42, 45).

---

[7] Accord *Crager v. Board of Education of Knott County*, 313 F. Supp. 2d 690, 702 (E.D. Ky. 2004) (refusing to enjoin random testing of teachers and school administrators, observing that "school personnel perform an essential monitoring role" and that if they are "under the influence of, or involved in, drugs, their ability to perform this critical function is not only reduced, but they themselves are open to being compromised and undermined.").

NFFE suggests that drug testing is not permitted in the absence of proof of a

drug problem.  (Br. at 19).  That assertion is unavailing for multiple reasons.  First,

there *is* persuasive evidence of a drug problem at Job Corps Centers.  As the

district court noted (slip op. at 7-8)(JA 21-22), the Senate hearings in 1995

uncovered  serious drug problems at Job Corps Centers.  See Nagel Decl. at ¶18

("In 1994-1995, a Senate oversight committee determined, after holding hearings,

that a drug problem existed in the Job Corps, and asked the responsible agencies

to address the problem.")(JA 180).[8]  It is also undisputed that the Senate's

investigation gave rise to the Secretary's decision to include Job Corps employees

as Testing Designated Positions back in 1996.  At least eight Job Corps employees

have been disciplined for drug use even in the absence of drug testing.  (Slip op. at

---

[8] The Senate Hearings may be found at Job Corps Oversight, Hearings
before the Senate Committee on Labor and Human Resources, 104th Congress, 1st
Sess. (January 18, and 19, 1995).  A copy of these hearings is available on-line at
http://web.lexis-
nexis.com/congcomp/attachment/a.pdf?_m=22beaf6f06e9ec9faccff2a06c937609&
wchp=dGLzVzk-zSkSA&_md5=6ffa36afa4abaed54d4f295e75b73e46&ie=a.pdf
These Hearings document a pervasive drug use problem at many Job Corps
Centers.  See *BNSF*, 566 F.3d at 203 (relying on Congressional hearings
documenting the existence of a drug problem).   The Committee Report that
resulted from those hearings is Report No. 104-118, Senate Committee on Labor
and Human Resources, 104th Congress, 1st Sess. (July 24, 1995), which can be
found on-line at be http://web.lexis-
nexis.com/congcomp/attachment/a.pdf?_m=223a02af0ff589db1cceeb1c3e993756
&wchp=dGLzVzk-
zSkSA&_md5=b825426961f9dfe0c049177968b3809c&ie=a.pdf

5 (JA 19), citing Dawson Decl. at ¶17) ("drug use has been found among JCCCC employees in the past, and several employees have been disciplined for drug use in recent years," including "eight JCCCC employees" who "have been subject to adverse actions, with penalties ranging from 14 day suspensions to removal, in recent years") (JA 140-41).  This documented background of drug use at Centers is more than a sufficient basis for the Secretary to act.  See *Earls*, 536 U.S. at 835 ("The School District has provided sufficient evidence to shore up the need for its drug testing program.").

Second, and in any event, the Secretary need not wait until a drug problem emerges before acting to prevent the development of a problem, particularly in this setting where the presence of drugs and any drug use would be particularly pernicious to the "at-risk" enrollees in this program.  As the district court held, "[t]o institute testing, the government need not demonstrate 'that a documented drug problem exist within the particular workplace.'"  (Slip op. at 15, quoting *Harmon v. Thornburgh*, 878 F.2d 484, 487 (D.C. Cir. 1989))(JA 29).  This rule makes obvious sense, as deterrence is critical as a means of effectuating a Zero Tolerance policy.  As the district court held, "the government does have a compelling interest to ensure that all JCCCC employees are drug-free since employees are entrusted to care for JCCCC students in a residential setting in rural areas and enforce a zero-tolerance drug environment for the at-risk students, even

- 41 -

if some employees may only be called upon to engage with students on a limited

basis or in emergency situations." (Slip op. at 26)(JA 40).

Indeed, deterrence has been consistently approved as an independently

sufficient rationale for drug testing. For example, in *Bell v. Wolfish*, 441 U.S. 520,

569-60 (1979), the Supreme Court sustained extremely intrusive body cavity strip

searches in prisons, even in the absence of actual proof of prisoner smuggling,

reasoning that the absence of such proof was evidence of the "effectiveness of this

search technique *as a deterrent.*" (441 U.S. at 559) (emphasis added). In *Von*

*Raab*, the Court approved suspicion-less testing as appropriate to "deter" and

"prevent" drug use even in the absence of an actual drug problem in the Customs

Service. *Van Raab*, 489 U.S. at 666-71. In *Vernonia*, the Court stated that

"[d]eterring drug use by our Nation's schoolchildren is at least as important" as the

prevention interest in *Von Raab*. *Vernonia*, 515 U.S. at 661. The Court in *Earl*s

stressed the same point in expressly rejecting the court of appeals' holding that the

school had to demonstrate a drug problem to justify suspicion-less testing of

students. (536 U.S. at 835-36 ). See also *Samson,* 547 U.S. at 853 (holding that

the state had a legitimate interest in  "combating recidivism" among parolees).

The deterrence interest here is no less important and no less sufficient.

Finally, NFFE argues (Br. at 30-31) that the purposes of drug testing federal

employees at federally run Job Corps Centers is negated because the Secretary has

not yet required drug testing of private contractors that run other Job Corps

Centers.  The district court rejected this argument on grounds that the government

is not barred from addressing part of the problem simply because it has not

addressed all of the problem.  The court reasoned that "the government need not

wait to address a problem until it is able to address all contributing factors of the

problem."  (Slip op. at 32) (JA 46).  That ruling is plainly correct.

Indeed, as the district court held, this Court in *Stigile* rejected the same

argument made by plaintiff here.  In that case, plaintiffs, who were permanent pass

holders to the Old Executive Office Building, argued that testing for them was

unconstitutional because the policy did not require testing of interns and non-

permanent pass holders.  The Court rejected that contention, holding "[w]hat the

OMB does with other groups cannot control a Fourth Amendment challenge to the

drug testing of permanent passholders."  *Stigile* 110 F.3d at 807.  As the Court

explained, "[w]e cannot require the government to attack all aspects of a problem

before we will uphold its right to act against a single aspect."  (Id.).  So too here.

D.    **The Secretary Is Not Required To Limit Drug Testing To Particular Positions Where The Underlying Danger Sought To Be Avoided Encompasses All Positions At Job Corps Centers**

NFFE contends that the Secretary erred in including all Job Corps employee

positions as Testing Designated Positions because, according to the NFFE, the

"court should review the requirements and responsibilities *of each employee*

- 43 -

*position* or class of similarly situated positions." (Br. at 19) (emphasis added).

NFFE misunderstands the balancing test. Stated simply, the individual duty

responsibilities of each employee are irrelevant where, as here, the governmental

interest at stake and the harm sought to be avoided requires that all employees be

covered by the testing requirement, regardless of the individual employee's

position and individual responsibilities. The district court did not err in applying

this principle. See Slip op. at 25.

This Court's decision in *Stigile v. Clinton*, 110 F.3d 801 (D.C. Cir. 1997), is

on point. In *Stigile*, as in this case, the challenged rule imposed drug testing on a

whole class of individuals without regard to their individual job duties, *viz.*, all

employees with permanent access to the Old Executive Office Building. This

Court nonetheless sustained the testing and, in so holding, emphatically rejected

the plaintiffs' contention that there must be some sort of "direct nexus" between

the nature of the employees' duties and the nature of the feared violation. Rather,

the Court explained that "a duty which places the employee in a position to render

harm can give rise to that nexus even when the feared act by the employee would

not itself be a normal part of that duty." (110 F.3d at 805). In other words,

"[w]hat the nexus requirement demands then is that there be an immediate,

non-attenuated connection between the employee's drug use *and the danger to be*

*avoided*."  (Id.) (emphasis added).  That test applied even though the danger to be avoided in *Stigile* was "extremely unlikely."  (110 F.3d at 806).

This rule, as articulated in *Stigile*, makes clear that an important part of the relevant inquiry is on "the danger to be avoided," not necessarily on whether the employee's particular job duties involve other dangers.  For example, drug testing has been sustained for employees whose jobs are safety related or involve classified information or the possession of firearms.  In those situations, "the danger to be avoided" is a lapse in a safety function, or the disclosure of classified information or the unsafe use of a firearm.  But, as *Stigile* holds, these are not the only dangers that drug testing is permitted to address.  The plaintiffs in *Stigile* were "Financial Economists with the OMB," *Stigile*, 101 F.3d at 802; these economists did not have safety-related duties or carry firearms or have access to classified information.  The Court held that even though it was "extremely unlikely" that the plaintiffs posed any threat to President or Vice President, the testing was nonetheless constitutional for these employees as well as all other employees with permanent access to the Old Executive Office Building because the "danger to be avoided" was the risk to the security of the Vice President and the President that mere access could involve.  *Stigile*, 110 F.3d at 806.  Plaintiff is thus plainly wrong in arguing that this Court will only "uphold random suspicion-less drug testing as constitutional on a position-by-position basis."  (Br. at 36).

In this case, all USFS Job Corps employees are covered by the testing requirement precisely because "the danger to avoided" was the risk to the already "at-risk" students posed by the mere presence and use of drugs at these rural, residential Job Corps centers. See *Earls*, 586 U.S. at 836 ("the need to prevent and deter the substantial harm of childhood drug use provides the necessary immediacy for a school testing policy"). The danger is presented by all staff members, regardless of their specific duties, as all these covered staff members are present at the Job Corps Centers. The risk sought to be avoided thus pertains to all employees at these Job Corps Centers, regardless of their actual duties. The district court did not err in so holding. See *Stigile*, 110 F.3d at 810 (Rogers, J., concurring) ("so long as the 'possible harm against which the Government seeks to guard is substantial,' and has some reasonable possibility of occurring, a drug testing program, as here, that sufficiently minimizes the intrusion into employees' privacy does not violate the Fourth Amendment.") (quoting *Von Raab*, 489 U.S. at 674-75).

In this respect, plaintiff faults the district court for supposedly not giving plaintiff all favorable inferences in its opposition to the motion for summary judgment and for "focusing on the overall nature of the JCCCCs and not analyzing each position covered by the USDA Drug Testing Regulation." (Br. at 27-28). Yet, the inferences that plaintiff seeks relate to the particular duties of individual

employees and are thus only relevant under the NFFE's legal theory that a position-by-position inquiry is constitutionally required. See Plaintiff's Br. at 19-20. If that theory is wrong, as the district court held, then those "inferences" are immaterial for purposes of ruling on the Secretary's motion for summary judgment. See Slip op. at 14 n.5 ("the factual disputes noted by the plaintiff in that section of its brief are fairly insignificant and, in any event, not sufficiently material to bar summary judgment.") (JA 28).

As an ancillary argument, the NFFE also implies that the Secretary should be restricted to individualized suspicion testing, noting that the random testing would apply to individuals who have never been tested on reasonable suspicion grounds. See Br. at 26-27. Yet, there is no constitutional requirement that the government restrict testing to reasonable suspicion cases where the danger to be avoided is reasonably addressed by random testing. The Supreme Court has squarely rejected that argument in the drug testing context, both in *Vernonia*, 515 U.S. at 663, and in *Skinner*, 489 U.S. at 629 n.9. In *Vernonia*, for example, the Court found it sufficient that testing of students on "suspicion of drug use" might be "impracticable," noting that requirement might encounter "substantial difficulties," such as increased costs and an added burden on schoolteachers, as well as attach an undesirable stigma to the testing process. *Vernonia*, 515 U.S. at 663-64. Similarly in *Samson*, the Court held that requiring individualized

- 47 -

suspicion would give parolees a "greater opportunity to anticipate searches and conceal criminality." *Samson*, 547 U.S. at 854.  In *Earl*s, the Court stated that "this Court has not required a particularized or pervasive drug problem before allowing the government to conduct suspicionless drug testing" and "it would make little sense to require a school district to wait for a substantial portion of its students to begin using drugs before it was allowed to institute a drug testing program designed to deter drug use."  (536 U.S. at 835-36).

These types of practical "difficulties" are also present here.  As in *Samson,* limiting testing to suspicion cases would allow these employees to anticipate searches and thus better conceal continued drug use.  As in *Vernonia*, testing on suspicion only would attach stigma to the test and invite conflict and add uncertainty to what should be a routine process for these employees.  Such limited testing would also do little to deter continued drug use by employees.  Indeed, by the time an individual is impaired frequently enough to arouse suspicion, his or her drug use could have gone on for months or years, thereby fostering the very dangers to Job Corps students that the Zero Tolerance policy was designed to prevent.  As *Earls* recognizes, it makes "little sense" to allow a drug problem to take hold before the government is "allowed to institute a drug testing program designed to deter drug use," especially in an educational setting like Job Corps Centers.  *Earls*, 536 U.S. at 836.

- 48 -

### E.     NFFE's Reliance On *Chandler* Is Without Merit

The NFFE erroneously places heavy reliance on the Supreme Court's

decision in *Chandler v. Miller*, 520 U.S. 305 (1997), arguing that *Chandler* "is the

most recent Supreme Court case on point and post-dates all the cited Circuit case

law." (Br. at 18).  First, that assertion that *Chandler* is the "most recent" decision

is dead wrong as a chronological matter, as the Supreme Court's 2002 decision in

*Earls* post-dates *Chandler* by years.  Second, in any event, *Chandler* did not

purport to alter the test applied in *Von Raab*, *Skinner* or *Vernonia*.  Certainly, no

court has read *Chandler* as representing a change in the law that supercedes

*Skinner* and *Von Raab*.  For example, *Chandler* is not even mentioned in *BNSF* and

is cited by the Court in *Aeronautical Repair Station* only in *rejecting* an argument

based on *Chandler* made by the plaintiff in that case.  (494 F.3d at 175).[9]  Both of

these recent decisions of this Court continued to apply *Von Raab, Skinner,*

*Vernonia* as well as the earlier Circuit decisions.  NFFE is also dead wrong in

berating the district court for "ignor[ing]" *Chandler* and its "teachings." (Br. at

18).  In fact, the district court both cites and discusses *Chandler* at some length, but

---

[9] The plaintiff in *Aeronautical Repair Station* quoted *Chandler* in arguing
"that the additional testing 'simply 'is not needed''" in light of the airworthiness
testing all aviation components undergo before being placed in service."  *Aero-
nautical Repair Station*, 494 F.3d at 174.  This Court "reject[ed]" that argument,
holding that the contractor positions at issue there bore a sufficient nexus to safety
under the principles set forth in *Stigile*.  (Id.).

found the decision to be inapposite.  See Slip op. at 17 & n. 6, 32-33.  (JA 31, 46-47).

The NFFE also asserts that *Chandler* supercedes *Vernonia* and thus argues that the district court erred in following the principles articulated in *Vernonia*.  (Br. at 38-39).  Yet no court, including this Court in cases post-dating *Chandler*, has held or suggested that *Vernonia* should be limited to its particular facts, as NFFE seems to assert in its brief to this Court.  (Br. at 38-40).  Indeed, this Court's most recent decision in this area cited and applied *Vernonia* without any suggestion that the case should be read narrowly.  See *BNSF*, 566 F.3d at 206.  Similarly, this Court in *Aeronautical Repair Station* expressly applied the Court's decision in *Stigile*, which was decided the same day as *Chandler*.  *Aeronautical Repair Station*, 494 F.3d at 174.  Thus, contrary to NFFE's contentions (Br. at 39), the district court did not err in relying on the principles identified in *Vernonia* and in the other decisions of this Court in formulating and applying the balancing test.

That *Von Raab, Skinner* and *Vernonia* remain good law is further confirmed by the Supreme Court's decision in *Earls,* where the Court cited *Chandler,* but then expressly returned to the "teachings" of *Van Raab, Skinner* and *Vernonia* in holding that "this Court has not required a particularized or pervasive drug problem before allowing the government to conduct suspicionless drug testing."  *Earls*, 536 U.S. at 835.  *Earls* thus reaffirms the very principles cited and relied on by the

district court in this case.  Tellingly, plaintiff makes no mention of *Earls* anywhere in its brief to this Court, failing to cite the decision even though it post-dates *Chandler*.

In any event, even a cursory review of *Chandler* reveals that the decision is not "on point," as the NFFE asserts.  (Br. at 18).  In *Chandler*, state candidates for office in Georgia brought suit to challenge a state statute requiring candidates to submit to and pass a drug test to qualify for state office.  The Court struck down the requirement under the Fourth Amendment, but in so doing, the Court distinguished *Von Raab, Skinner* and *Vernonia*; it did not purport to overrule or limit these decisions.  See *Chandler*, 520 U.S. at 314-318.  To the contrary, the Court applied the same balancing test in *Chandler*, holding that Georgia had failed to present any "special need" for drug testing "important enough to override the individual's acknowledged privacy interest."  (520 U.S. at 318).  In particular, the Court found that Georgia's drug "certification requirement" to be "not well designed to identify candidates who violate antidrug laws" and that the scheme was not "a credible means to deter illicit drug users from seeking election to state office."  (520 U.S. at 319).  What was left, the Court concluded, was that the Georgia's need was merely "symbolic" of "its commitment to the struggle against drug abuse"  (520 U.S. at 321-22), and that, therefore, the "public safety [was] not genuinely in jeopardy." (520 U.S. at 323).

- 51 -

As is apparent, the actual holding of *Chandler* is that drug testing cannot be justified solely on symbolic grounds. That is an important holding, but it hardly applies to random testing policies supported by other rationales and circumstances. Here, as the district court expressly held in rejecting NFFE's reliance on *Chandler*, (Slip op. at 32-33) (JA 46-47), the Secretary's random drug testing of Job Corps employees is not based in the slightest on any perceived "symbolic" need to demonstrate against drug abuse. Rather, as the district court recognized, "[t]he defendants' interests in testing JCCCC employees are not merely symbolic, but are directed toward maintaining the effectiveness of the JCCCC program and ensuring the safety of students located in remote rural sites across the country." (Slip op. at 33) (JA 47). Thus, far from failing "to consider" *Chandler*, as NFFE wrongly asserts (Br. at 18), the district court actually the reviewed and rejected on the merits NFFE's argument based on *Chandler*. The court's holding was correct.

Moreover, unlike the testing at issue in *Chandler*, the testing here is designed to detect drug use that could easily place the safety of students in direct jeopardy, both by making drugs more available at the site and by impairing the ability of staff to carry out their duties shared by all staff, including the duty to enforce a Zero Tolerance policy and the duty to react in an emergency situation that may arise at these residential sites. In contrast to *Chandler,* where the Court found that the policy was entirely ineffective in deterring drug use, the random testing at issue here

- 52 -

is "well designed" to serve as a significant deterrent.  As administered in accordance

with HHS Guidelines and policies, such random testing, by its very nature, detects

drug use in a manner that employees cannot not predict or guard against.  Drug

using employees who have heretofore successfully concealed their drug use would

face a new risk of detection that may lead them to stop drug use or seek treatment

available to employees under USDA's Employee Assistance Program.  See Drug

Free Workplace Program, Part 6(a).  (JA 76).  Other employees would be deterred

from experimenting with drugs or otherwise beginning to use drugs.  Nothing in

*Chandler*'s holding can be reasonably understood as undermining the Secretary's

reasoned decision to act in these circumstances.

## III.  THE DISTRICT COURT DID NOT ERR IN DENYING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

As NFFE readily concedes, this Court "reviews a decision regarding a

preliminary injunction for abuse of discretion."  (Br. at 45, citing *Katz v.*

*Georgetown Univ.*, 246 F.3d 685, 688 (D.C. Cir. 2001)).  Yet, NFFE nonetheless

argues, in an *ipse dixit*, that the district court abused its discretion in this case

because "NFFE is likely to show that the USDA Drug Testing Regulation is

impermissibly broad."  (Br. at 46).  That assertion, of course, is contradicted by the

district court's grant of summary judgment for the Secretary.  Plainly, if the district

court was correct in granting summary judgment, then the district court was likewise correct in denying the motion for preliminary relief.

The foregoing disposes of NFFE's demand that this Court issue a preliminary injunction.  However, in the abundance of caution, we note that issuance of a preliminary injunction by this Court would be inappropriate in any event.  A preliminary injunction is a matter addressed, in the first instance, to the district court's equitable discretion.  Thus, even assuming *arguendo* that the district court somehow erred in entering summary judgment for the Secretary, the proper course would be a remand, not for this Court to order preliminary equitable relief for plaintiff, as the NFFE demands.  (Br. at 48).  See, e.g., *Smith, Bucklin & Associates, Inc. v. Sonntag*, 83 F.3d 476, 479 (D.C. Cir. 1996) ("a district court's decision whether to grant a preliminary injunction is reviewed under the deferential standard of 'abuse of discretion' . . . because such a decision is typically based on equitable considerations that are properly considered and weighed by the lower court.").  On any such remand, plaintiff would be required to carry its burden of proof on each of the four factors that must be shown in order to obtain preliminary injunctive relief.  See, e.g., *Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1291 (D.C. Cir. 2009).  Because the district court issued summary judgment for the Secretary, the court never considered or weighed all four of these factors in denying preliminary relief.

## CONCLUSION

For all the foregoing reasons, the judgment below should be affirmed.

Respectfully submitted,

*/s/ Mark W. Pennak*

TONY WEST,
  *Assistant Attorney General*

LEONARD SCHAITMAN
  (202) 514-3441

MARK W. PENNAK
  (202) 514-1673
  *Attorneys*
  *Appellate Staff*
  *Civil Division, Room 7326 MAIN*
  *Department of Justice*
NOVEMBER 2011                    Washington, D.C. 20530

- 55 -

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure, the undersigned hereby certifies that the foregoing Final Brief of defendants-appellees, the Secretary of Agriculture, et al., is in a proportional font with serifs, i.e., Times New Roman, utilizes 14-point type size in both text and footnotes, is double-spaced, except in headings and footnotes, and is 12,861 words long, excluding from that total the table of contents, the table of authorities and certificates, as determined by the word-count function of version 14 of the WordPerfect word processing software.

*/s/ Mark W. Pennak*

_____

Mark W. Pennak

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| NATIONAL FEDERATION OF <br> FEDERAL EMPLOYEES – IAM, <br><br>     Plaintiff-Appellant <br><br>     v. <br><br> THOMAS J. VILSACK, SECRETARY, <br> UNITED STATES DEPARTMENT <br> OF AGRICULTURE, et. al.,, <br><br>     Defendant-Appellant <br> _____ | ) <br> ) <br> ) <br> ) <br> ) <br> )     No. 11-5135 <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**CERTIFICATE OF SERVICE**

I hereby certify that on November 29, 2011, I served a copy of the Final Brief of the Appellees, Secretary of Department of Agriculture, et al., upon the following named counsel, by electronic service through the ECF process:

STEFAN P. SUTICH,
General Counsel
National Federation of
Federal Employees
850 15th Street NW Ste. 500
Washington, D.C. 20005
(202) 216-4457

_____/s/ Mark W. Pennak_____
Counsel for defendants-appellees

**STATUTORY ADDENDUM**

# INDEX TO STATUTORY ADDENDUM

1.    Fourth Amendment

2.    29 U.S.C. 2881

3.    29 U.S.C. 2882

4.    29 U.S.C. 2884

5.    29 U.S.C. 2888

6.    29 U.S.C. 2892

7.    20 C.F.R. 670.540

8.    Executive Order 12564

9.    Pub.L. 100-71, Title V, § 503, July 11, 1987, 101 Stat. 468, as amended
      Pub.L. 102-54, § 13(b)(6), June 13, 1991, 105 Stat. 274

## FOURTH AMENDMENT TO THE CONSTITUTION

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

29 U.S.C.A. § 2881                                                                                    Page 1

C

**Effective: August 7, 1998**

United States Code Annotated Currentness
    Title 29. Labor
        Chapter 30. Workforce Investment Systems
           Subchapter III. Job Corps
                **§ 2881. Purposes**

The purposes of this subchapter are--

  **(1)** to maintain a national Job Corps program, carried out in partnership with States and communities, to assist eligible youth who need and can benefit from an intensive program, operated in a group setting in residential and nonresidential centers, to become more responsible, employable, and productive citizens;

  **(2)** to set forth standards and procedures for selecting individuals as enrollees in the Job Corps;

  **(3)** to authorize the establishment of Job Corps centers in which enrollees will participate in intensive programs of activities described in this subchapter; and

  **(4)** to prescribe various other powers, duties, and responsibilities incident to the operation and continuing development of the Job Corps.

CREDIT(S)

(Pub.L. 105-220, Title I, § 141, Aug. 7, 1998, 112 Stat. 1006.)

Current through P.L. 112-39 (excluding P.L. 112-34) approved 10-12-11

Westlaw. (C) 2011 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

C

**Effective: August 7, 1998**

United States Code Annotated Currentness
   Title 29. Labor
      Chapter 30. Workforce Investment Systems
         Subchapter III. Job Corps
         ➡➡ **§ 2882. Definitions**

In this subchapter:

(1) Applicable local board

The term "applicable local board" means a local board--

   **(A)** that provides information for a Job Corps center on local employment opportunities and the job skills needed to obtain the opportunities; and

   **(B)** that serves communities in which the graduates of the Job Corps center seek employment.

(2) Applicable one-stop center

The term "applicable one-stop center" means a one-stop customer service center that provides services, such as referral, intake, recruitment, and placement, to a Job Corps center.

(3) Enrollee

The term "enrollee" means an individual who has voluntarily applied for, been selected for, and enrolled in the Job Corps program, and remains with the program, but has not yet become a graduate.

(4) Former enrollee

The term "former enrollee" means an individual who has voluntarily applied for, been selected for, and enrolled in the Job Corps program, but left the program before completing the requirements of a vocational training program, or receiving a secondary school diploma or recognized equivalent, as a result of participation in the Job Corps program.

(5) Graduate

The term "graduate" means an individual who has voluntarily applied for, been selected for, and enrolled in the Job Corps program and has completed the requirements of a vocational training program, or received a secondary school diploma or recognized equivalent, as a result of participation in the Job Corps program.


(6) Job Corps

The term "Job Corps" means the Job Corps described in section 2883 of this title.


(7) Job Corps center

The term "Job Corps center" means a center described in section 2887 of this title.


(8) Operator

The term "operator" means an entity selected under this subchapter to operate a Job Corps center.


(9) Region

The term "region" means an area served by a regional office of the Employment and Training Administration.


(10) Service provider

The term "service provider" means an entity selected under this subchapter to provide services described in this subchapter to a Job Corps center.


CREDIT(S)

(Pub.L. 105-220, Title I, § 142, Aug. 7, 1998, 112 Stat. 1006.)


HISTORICAL AND STATUTORY NOTES

Revision Notes and Legislative Reports

1998 Acts. House Conference Report No. 105-659, see 1998 U.S. Code Cong. and Adm. News, p. 343.


Effective and Applicability Provisions

1998 Acts. Section effective Aug. 7, 1998, except as otherwise provided, see section 507 of Pub.L. 105-220, set out as a note under section 9201 of Title 20.


29 U.S.C.A. § 2882, 29 USCA § 2882

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

C

**Effective: August 7, 1998**

United States Code Annotated Currentness
  Title 29. Labor
    Chapter 30. Workforce Investment Systems
      Subchapter III. Job Corps
        ➡➡ **§ 2884. Individuals eligible for the Job Corps**

To be eligible to become an enrollee, an individual shall be--

  **(1)** not less than age 16 and not more than age 21 on the date of enrollment, except that--

    **(A)** not more than 20 percent of the individuals enrolled in the Job Corps may be not less than age 22 and not more than age 24 on the date of enrollment; and

    **(B)** either such maximum age limitation may be waived by the Secretary, in accordance with regulations of the Secretary, in the case of an individual with a disability;

  **(2)** a low-income individual; and

  **(3)** an individual who is one or more of the following:

    **(A)** Basic skills deficient.

    **(B)** A school dropout.

    **(C)** Homeless, a runaway, or a foster child.

    **(D)** A parent.

    **(E)** An individual who requires additional education, vocational training, or intensive counseling and related assistance, in order to participate successfully in regular schoolwork or to secure and hold employment.

CREDIT(S)



**Effective: August 7, 1998**

United States Code Annotated Currentness
  Title 29. Labor
    Chapter 30. Workforce Investment Systems
      Subchapter III. Job Corps
        →→ **§ 2888. Program activities**

(a) Activities provided by Job Corps centers

  (1) In general

Each Job Corps center shall provide enrollees with an intensive, well organized, and fully supervised program of education, vocational training, work experience, recreational activities, physical rehabilitation and development, and counseling. Each Job Corps center shall provide enrollees assigned to the center with access to core services described in section 2864(d)(2) of this title and the intensive services described in section 2864(d)(3) of this title.

  (2) Relationship to opportunities

    (A) In general

The activities provided under this subsection shall provide work-based learning throughout the enrollment of the enrollees and assist the enrollees in obtaining meaningful unsubsidized employment, participating in secondary education or postsecondary education programs, enrolling in other suitable vocational training programs, or satisfying Armed Forces requirements, on completion of their enrollment.

    (B) Link to employment opportunities

The vocational training provided shall be linked to the employment opportunities in the local area in which the enrollee intends to seek employment after graduation.

(b) Education and vocational training

The Secretary may arrange for education and vocational training of enrollees through local public or private educational agencies, vocational educational institutions, or technical institutes, whenever such entities provide education and training substantially equivalent in cost and quality to that which the Secretary could provide through other means.

(c) Advanced career training programs

(1) In general

The Secretary may arrange for programs of advanced career training for selected enrollees in which the en-rollees may continue to participate for a period of not to exceed 1 year in addition to the period of participa-tion to which the enrollees would otherwise be limited. The advanced career training may be provided through the eligible providers of training services identified under section 2842 of this title.

(2) Benefits

(A) In general

During the period of participation in an advanced career training program, an enrollee shall be eligible for full Job Corps benefits, or a monthly stipend equal to the average value of the residential support, food, al-lowances, and other benefits provided to enrollees assigned to residential Job Corps centers.

(B) Calculation

The total amount for which an enrollee shall be eligible under subparagraph (A) shall be reduced by the amount of any scholarship or other educational grant assistance received by such enrollee for advanced ca-reer training.

(3) Demonstration

Each year, any operator seeking to enroll additional enrollees in an advanced career training program shall demonstrate that participants in such program have achieved a satisfactory rate of completion and placement in training-related jobs before the operator may carry out such additional enrollment.

(d) Continued services

The Secretary shall also provide continued services to graduates, including providing counseling regarding the workplace for 12 months after the date of graduation of the graduates. In selecting a provider for such services, the Secretary shall give priority to one-stop partners.

(e) Child care

The Secretary shall, to the extent practicable, provide child care at or near Job Corps centers, for individuals who require child care for their children in order to participate in the Job Corps.

CREDIT(S)

(Pub.L. 105-220, Title I, § 148, Aug. 7, 1998, 112 Stat. 1011.)

HISTORICAL AND STATUTORY NOTES

c

**Effective: August 7, 1998**

United States Code Annotated Currentness
  Title 29. Labor
    Chapter 30. Workforce Investment Systems
      Subchapter III. Job Corps
        → → § 2892. Standards of conduct

(a) Provision and enforcement

The Secretary shall provide, and directors of Job Corps centers shall stringently enforce, standards of conduct within the centers. Such standards of conduct shall include provisions forbidding the actions described in subsection (b)(2)(A) of this section.

(b) Disciplinary measures

  (1) In general

  To promote the proper moral and disciplinary conditions in the Job Corps, the directors of Job Corps centers shall take appropriate disciplinary measures against enrollees. If such a director determines that an enrollee has committed a violation of the standards of conduct, the director shall dismiss the enrollee from the Job Corps if the director determines that the retention of the enrollee in the Job Corps will jeopardize the enforcement of such standards or diminish the opportunities of other enrollees.

  (2) Zero tolerance policy and drug testing

    (A) Guidelines

    The Secretary shall adopt guidelines establishing a zero tolerance policy for an act of violence, for use, sale, or possession of a controlled substance, for abuse of alcohol, or for other illegal or disruptive activity.

    (B) Drug testing

    The Secretary shall require drug testing of all enrollees for controlled substances in accordance with procedures prescribed by the Secretary under section 2885(a) of this title.

    (C) Definitions

    In this paragraph:

(i) Controlled substance

The term "controlled substance" has the meaning given the term in section 802 of Title 21.

(ii) Zero tolerance policy

The term "zero tolerance policy" means a policy under which an enrollee shall be automatically dismissed from the Job Corps after a determination by the director that the enrollee has carried out an action described in subparagraph (A).

(c) Appeal

A disciplinary measure taken by a director under this section shall be subject to expeditious appeal in accordance with procedures established by the Secretary.

CREDIT(S)

(Pub.L. 105-220, Title I, § 152, Aug. 7, 1998, 112 Stat. 1013.)

HISTORICAL AND STATUTORY NOTES

Revision Notes and Legislative Reports

1998 Acts. House Conference Report No. 105-659, see 1998 U.S. Code Cong. and Adm. News, p. 343.

Effective and Applicability Provisions

1998 Acts. Section effective Aug. 7, 1998, except as otherwise provided, see section 507 of Pub.L. 105-220, set out as a note under section 9201 of Title 20.

Prior Provisions

Provisions similar to this section were contained in 29 U.S.C.A. § 1700 prior to repeal by Pub.L. 105-220.

LIBRARY REFERENCES

Corpus Juris Secundum

CJS Social Security and Public Welfare § 32, Workforce Investment Activities.

29 U.S.C.A. § 2892, 29 USCA § 2892

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**C**

**Effective:[See Text Amendments]**

Code of Federal Regulations Currentness
  Title 20. Employees' Benefits
    Chapter V. Employment and Training Administration, Department of Labor
      ▤ Part 670. The Job Corps Under Title I of the Workforce Investment Act (Refs & Annos)
        ▤ Subpart E. Program Activities and Center Operations
        ➡ **§ 670.540 What is Job Corps' zero tolerance policy?**

(a) Each Job Corps center must have a zero tolerance policy for:

(1) An act of violence, as defined in procedures issued by the Secretary;

(2) Use, sale, or possession of a controlled substance, as defined at 21 U.S.C. 802;

(3) Abuse of alcohol;

(4) Possession of unauthorized goods; or

(5) Other illegal or disruptive activity.

(b) As part of this policy, all students must be tested for drugs as a condition of enrollment. (WIA sec. 145(a)(1) and 152(b)(2).)

(c) According to procedures issued by the Secretary, the policy must specify the offenses that result in the automatic separation of a student from the Job Corps. The center director is responsible for determining when there is a violation of a specified offense.

SOURCE: 65 FR 49388, 49450, Aug. 11, 2000; 69 FR 41891, July 12, 2004, unless otherwise noted.

AUTHORITY: Subtitle C of title I, sec. 506(c), Pub.L. 105-220, 112 Stat. 936 (20 U.S.C. 2881 et seq. and 9276(c)); 5 U.S.C. 301; Executive Order 13198, 66 FR 8497; 3 CFR 2001 Comp., p. 750); Executive Order 13279, 67 FR 77141; 3 CFR 2002 Comp., p. 258.

20 C. F. R. § 670.540, 20 CFR § 670.540

Current through October 27, 2011; 76 FR 66844

© 2011 Thomson Reuters
END OF DOCUMENT

EXECUTIVE ORDER NO. 12564
<Sept. 15, 1986, 51 F.R. 32889>

DRUG-FREE FEDERAL WORKPLACE
I, RONALD REAGAN, President of the United States of America, find that:

Drug use is having serious adverse effects upon a significant proportion of the national work force and results in billions of dollars of lost productivity each year;

The Federal government, as an employer, is concerned with the well-being of its employees, the successful accomplishment of agency missions, and the need to maintain employee productivity;

The Federal government, as the largest employer in the Nation, can and should show the way towards achieving drug-free workplaces through a program designed to offer drug users a helping hand and, at the same time, demonstrating to drug users and potential drug users that drugs will not be tolerated in the Federal workplace;

The profits from illegal drugs provide the single greatest source of income for organized crime, fuel violent street crime, and otherwise contribute to the breakdown of our society;

The use of illegal drugs, on or off duty, by Federal employees is inconsistent not only with the law-abiding behavior expected of all citizens, but also with the special trust placed in such employees as servants of the public;

Federal employees who use illegal drugs, on or off duty, tend to be less productive, less reliable, and prone to greater absenteeism than their fellow employees who do not use illegal drugs;

The use of illegal drugs, on or off duty, by Federal employees impairs the efficiency of Federal departments and agencies, undermines public confidence in them, and makes it more difficult for other employees who do not use illegal drugs to perform their jobs effectively. The use of illegal drugs, on or off duty, by Federal employees also can pose a serious health and safety threat to members of the public and to other Federal employees;

The use of illegal drugs, on or off duty, by Federal employees in certain positions

evidences less than the complete reliability, stability, and good judgment that is consistent with access to sensitive information and creates the possibility of coercion, influence, and irresponsible action under pressure that may pose a serious risk to national security, the public safety, and the effective enforcement of the law; and

Federal employees who use illegal drugs must themselves be primarily responsible for changing their behavior and, if necessary, begin the process of rehabilitating themselves.

By the authority vested in me as President by the Constitution and laws of the United States of America, including section 3301(2) of Title 5 of the United States Code [section 3301(2) of this title], section 7301 of Title 5 of the United States Code [this section], section 290ee-1 of Title 42 of the United States Code [section 290ee-1 of Title 42, the Public Health and Welfare], deeming such action in the best interests of national security, public health and safety, law enforcement and the efficiency of the Federal service, and in order to establish standards and procedures to ensure fairness in achieving a drug-free Federal workplace and to protect the privacy of Federal employees, it is hereby ordered as follows:

Section 1. Drug-Free Workplace.

(a) Federal employees are required to refrain from the use of illegal drugs.

(b) The use of illegal drugs by Federal employees, whether on duty or off duty, is contrary to the efficiency of the service.

(c) Persons who use illegal drugs are not suitable for Federal employment.

Sec. 2. Agency Responsibilities.

(a) The head of each Executive agency shall develop a plan for achieving the objective of a drug-free workplace with due consideration of the rights of the government, the employee, and the general public.

(b) Each agency plan shall include:

(1) A statement of policy setting forth the agency's expectations regarding drug use and the action to be anticipated in response to identified drug use;

(2) Employee Assistance Programs emphasizing high level direction, education, counseling, referral to rehabilitation, and coordination with available community resources;

(3) Supervisory training to assist in identifying and addressing illegal drug use by agency employees;

(4) Provision for self-referrals as well as supervisory referrals to treatment with maximum respect for individual confidentiality consistent with safety and security issues; and

(5) Provision for identifying illegal drug users, including testing on a controlled and carefully monitored basis in accordance with this Order.

Sec. 3. Drug Testing Programs.

(a) The head of each Executive agency shall establish a program to test for the use of illegal drugs by employees in sensitive positions. The extent to which such employees are tested and the criteria for such testing shall be determined by the head of each agency, based upon the nature of the agency's mission and its employees' duties, the efficient use of agency resources, and the danger to the public health and safety or national security that could result from the failure of an employee adequately to discharge his or her position.

(b) The head of each Executive agency shall establish a program for voluntary employee drug testing.

(c) In addition to the testing authorized in subsections (a) and (b) of this section, the head of each Executive agency is authorized to test an employee for illegal drug use under the following circumstances:

(1) When there is a reasonable suspicion that any employee uses illegal drugs;

(2) In an examination authorized by the agency regarding an accident or unsafe practice; or

(3) As part of or as a follow-up to counseling or rehabilitation for illegal drug use through an Employee Assistance Program.

(d) The head of each Executive agency is authorized to test any applicant for illegal drug use.

Sec. 4. Drug Testing Procedures.

(a) Sixty days prior to the implementation of a drug testing program pursuant to this Order, agencies shall notify employees that testing for use of illegal drugs is to be conducted and that they may seek counseling and rehabilitation and inform them of the procedures for obtaining such assistance through the agency's Employee Assistance Program. Agency drug testing programs already ongoing are exempted from the 60-day notice requirement. Agencies may take action under section 3(c) of this Order without reference to the 60-day notice period.

(b) Before conducting a drug test, the agency shall inform the employee to be tested of the opportunity to submit medical documentation that may support a legitimate use for a specific drug.

(c) Drug testing programs shall contain procedures for timely submission of requests for retention of records and specimens; procedures for retesting; and procedures, consistent with applicable law, to protect the confidentiality of test results and related medical and rehabilitation records. Procedures for providing urine specimens must allow individual privacy, unless the agency has reason to believe that a particular individual may alter or substitute the specimen to be provided.

(d) The Secretary of Health and Human Services is authorized to promulgate scientific and technical guidelines for drug testing programs, and agencies shall conduct their drug testing programs in accordance with these guidelines once promulgated.

Sec. 5. Personnel Actions.

(a) Agencies shall, in addition to any appropriate personnel actions, refer any employee who is found to use illegal drugs to an Employee Assistance Program for assessment, counseling, and referral for treatment or rehabilitation as appropriate.

(b) Agencies shall initiate action to discipline any employee who is found to use illegal drugs, provided that such action is not required for an employee who:

(1) Voluntarily identifies himself as a user of illegal drugs or who volunteers for drug testing pursuant to section 3(b) of this Order, prior to being identified through other means;

(2) Obtains counseling or rehabilitation through an Employee Assistance Program; and

(3) Thereafter refrains from using illegal drugs.

(c) Agencies shall not allow any employee to remain on duty in a sensitive position who is found to use illegal drugs, prior to successful completion of rehabilitation through an Employee Assistance Program. However, as part of a rehabilitation or counseling program, the head of an Executive agency may, in his or her discretion, allow an employee to return to duty in a sensitive position if it is determined that this action would not pose a danger to public health or safety or the national security.

(d) Agencies shall initiate action to remove from the service any employee who is found to use illegal drugs and:

(1) Refuses to obtain counseling or rehabilitation through an Employee Assistance Program; or

(2) Does not thereafter refrain from using illegal drugs.

(e) The results of a drug test and information developed by the agency in the course of the drug testing of the employee may be considered in processing any adverse action against the employee or for other administrative purposes. Preliminary test results may not be used in an administrative proceeding unless they are confirmed by a second analysis of the same sample or unless the employee confirms the accuracy of the initial test by admitting the use of illegal drugs.

(f) The determination of an agency that an employee uses illegal drugs can be made on the basis of any appropriate evidence, including direct observation, a criminal conviction, administrative inquiry, or the results of an authorized testing program. Positive drug test results may be rebutted by other evidence that an employee has not used illegal drugs.

(g) Any action to discipline an employee who is using illegal drugs (including removal from the service, if appropriate) shall be taken in compliance with otherwise applicable procedures, including the Civil Service Reform Act [Civil Service Reform Act of 1978, Pub.L. 95-454, Oct. 13, 1978, 92 Stat. 1111, see Tables for classification].

(h) Drug testing shall not be conducted pursuant to this Order for the purpose of gathering evidence for use in criminal proceedings. Agencies are not required to report to the Attorney General for investigation or prosecution any information, allegation, or evidence relating to violations of Title 21 of the United States Code received as a result of the operation of drug testing programs established pursuant to this Order.

Sec. 6. Coordination of Agency Programs.

(a) The Director of the Office of Personnel Management shall:

(1) Issue government-wide guidance to agencies on the implementation of the terms of this Order;

(2) Ensure that appropriate coverage for drug abuse is maintained for employees and their families under the Federal Employees Health Benefits Program;

(3) Develop a model Employee Assistance Program for Federal agencies and assist the agencies in putting programs in place;

(4) In consultation with the Secretary of Health and Human Services, develop and improve training programs for Federal supervisors and managers on illegal drug use; and

(5) In cooperation with the Secretary of Health and Human Services and heads of Executive agencies, mount an intensive drug awareness campaign throughout the Federal work force.

(b) The Attorney General shall render legal advice regarding the implementation of this Order and shall be consulted with regard to all guidelines, regulations, and policies proposed to be adopted pursuant to this Order.

(c) Nothing in this Order shall be deemed to limit the authorities of the Director of

Central Intelligence under the National Security Act of 1947, as amended [Act July 26, 1947, c. 343, 61 Stat. 495, 50 U.S.C.A. § 401 et seq.], or the statutory authorities of the National Security Agency or the Defense Intelligence Agency. Implementation of this Order within the Intelligence Community, as defined in Executive Order No. 12333 [set out as a note under section 401 of Title 50, War and National Defense], shall be subject to the approval of the head of the affected agency.

Sec. 7. Definitions.

(a) This Order applies to all agencies of the Executive Branch.

(b) For purposes of this Order, the term "agency" means an Executive agency, as defined in 5 U.S.C. 105 [section 105 of this title]; the Uniformed Services, as defined in 5 U.S.C. 2101(3) [section 2101(3) of this title] (but excluding the armed forces as defined by 5 U.S.C. 2101(2)) [section 2101(2) of this title]; or any other employing unit or authority of the Federal government, except the United States Postal Service, the Postal Rate Commission [Postal Regulatory Commission], and employing units or authorities in the Judicial and Legislative Branches.

(c) For purposes of this Order, the term "illegal drugs" means a controlled substance included in Schedule I or II, as defined by section 802(6) of Title 21 of the United States Code [section 802(6) of Title 21 Food and Drugs], the possession of which is unlawful under chapter 13 of that Title [section 801 et seq. of Title 21]. The term "illegal drugs" does not mean the use of a controlled substance pursuant to a valid prescription or other uses authorized by law.

(d) For purposes of this Order, the term "employee in a sensitive position" refers to:

(1) An employee in a position that an agency head designates Special Sensitive, Critical-Sensitive, or Noncritical-Sensitive under Chapter 731 of the Federal Personnel Manual or an employee in a position that an agency head designates as sensitive in accordance with Executive Order No. 10450, as amended [set out as a note under section 7311 of this title];

(2) An employee who has been granted access to classified information or may be granted access to classified information pursuant to a determination of trustworthiness by an agency head under Section 4 of Executive Order No. 12356

[formerly set out as a note under 50 U.S.C.A. § 435];

(3) Individuals serving under Presidential appointments;

(4) Law enforcement officers as defined in 5 U.S.C. 8331(20) [section 8331(20) of this title]; and

(5) Other positions that the agency head determines involve law enforcement, national security, the protection of life and property, public health or safety, or other functions requiring a high degree of trust and confidence.

(e) For purposes of this Order, the term "employee" means all persons appointed in the Civil Service as described in 5 U.S.C. 2105 [section 2105 of this title] (but excluding persons appointed in the armed services as defined in 5 U.S.C. 2102(2)) [section 2102(2) of this title].

(f) For purposes of this Order, the term "Employee Assistance Program" means agency-based counseling programs that offer assessment, short-term counseling, and referral services to employees for a wide range of drug, alcohol, and mental health programs that affect employee job performance. Employee Assistance Programs are responsible for referring drug-using employees for rehabilitation and for monitoring employees' progress while in treatment.

Sec. 8. Effective Date. This Order is effective immediately.

[Reference to the Director of Central Intelligence or the Director of the Central Intelligence Agency in the Director's capacity as the head of the intelligence community deemed to be a reference to the Director of National Intelligence. Reference to the Director of Central Intelligence or the Director of the Central Intelligence Agency in the Director's capacity as the head of the Central Intelligence Agency deemed to be a reference to the Director of the Central Intelligence Agency. See Pub. L. 108-458, § 1081(a), (b), set out as a note under 50 U.S.C.A. § 401.]

Pub.L. 100-71, Title V, § 503, July 11, 1987, 101 Stat. 468, as amended Pub.L. 102-54, § 13(b)(6), June 13, 1991, 105 Stat. 274, provided:

"(a)(1) Except as provided in subsection (b) or (c), none of the funds appropriated or made available by this Act, or any other Act, with respect to any fiscal year, shall be available to administer or implement any drug testing pursuant to Executive Order Numbered 12564 (dated September 15, 1986) [set out as a note under this section] or any subsequent order, unless and until--

"(A) the Secretary of Health and Human Services certifies in writing to the Committees on Appropriations of the House of Representatives and the Senate, and other appropriate committees of the Congress, that--

"(i) each agency has developed a plan for achieving a drug-free workplace in accordance with Executive Order Numbered 12564 and applicable provisions of law (including applicable provisions of this section);

"(ii) the Department of Health and Human Services, in addition to the scientific and technical guidelines dated February 13, 1987, and any subsequent amendments thereto, has, in accordance with paragraph (3), published mandatory guidelines which--

"(I) establish comprehensive standards for all aspects of laboratory drug testing and laboratory procedures to be applied in carrying out Executive Order Numbered 12564, including standards which require the use of the best available technology for ensuring the full reliability and accuracy of drug tests and strict procedures governing the chain of custody of specimens collected for drug testing;

"(II) specify the drugs for which Federal employees may be tested; and

"(III) establish appropriate standards and procedures for periodic review of laboratories and criteria for certification and revocation of certification of laboratories to perform drug testing in carrying out Executive Order Numbered 12564; and

"(iii) all agency drug-testing programs and plans established pursuant to Executive Order Numbered 12564 comply with applicable provisions of law, including applicable provisions of the Rehabilitation Act of 1973 (29 U.S.C. 701 et seq.) [section 701 et seq. of Title 29, Labor], title 5 of the United States Code, and the mandatory guidelines under clause (ii);

"(B) the Secretary of Health and Human Services has submitted to the Congress, in writing, a detailed, agency-by-agency analysis relating to--

"(i) the criteria and procedures to be applied in designating employees or positions for drug testing, including the justification for such criteria and procedures;

"(ii) the position titles designated for random drug testing; and

"(iii) the nature, frequency, and type of drug testing proposed to be instituted; and

"(C) the Director of the Office of Management and Budget has submitted in writing to the Committees on Appropriations of the House of Representatives and the Senate a detailed, agency-by-agency analysis (as of the time of certification under subparagraph (A)) of the anticipated annual costs associated with carrying out Executive Order Numbered 12564 and all other requirements under this section during the 5-year period beginning on the date of the enactment of this Act [July 11, 1987].

"(2) Notwithstanding subsection (g), for purposes of this subsection, the term 'agency' means--
"(A) the Executive Office of the President;
"(B) an Executive department under section 101 of title 5, United States Code [section 101 of this title];
"(C) the Environmental Protection Agency;
"(D) the General Services Administration;
"(E) the National Aeronautics and Space Administration;
"(F) the Office of Personnel Management;
"(G) the Small Business Administration;
"(H) the United States Information Agency; and
"(I) the Department of Veterans Affairs;

except that such term does not include the Department of Transportation or any other entity (or component thereof) covered by subsection (b).

"(3) Notwithstanding any provision of chapter 5 of title 5, United States Code [section 500 et seq. of this title], the mandatory guidelines to be published pursuant to subsection (a)(1)(A)(ii) shall be published and made effective exclusively according to the provisions of this paragraph. Notice of the mandatory guidelines proposed by the Secretary of Health and Human Services shall be published in the Federal Register, and interested persons shall be given not less than 60 days to submit written comments on the proposed mandatory guidelines. Following review and consideration of written comments, final mandatory guidelines shall be published in the Federal Register and shall become effective upon publication.

"(b)(1) Nothing in subsection (a) shall limit or otherwise affect the availability of funds for drug testing by--
"(A) the Department of Transportation;
"(B) Department of Energy, for employees specifically involved in the handling of

nuclear weapons or nuclear materials;

"(C) any agency with an agency-wide drug-testing program in existence as of September 15, 1986; or

"(D) any component of an agency if such component had a drug-testing program in existence as of September 15, 1986.

"(2) The Departments of Transportation and Energy and any agency or component thereof with a drug-testing program in existence as of September 15, 1986--

"(A) shall be brought into full compliance with Executive Order Numbered 12564 [set out as a note under this section] no later than the end of the 6-month period beginning on the date of the enactment of this Act [July 11, 1987]; and

"(B) shall take such actions as may be necessary to ensure that their respective drug-testing programs or plans are brought into full compliance with the mandatory guidelines published under subsection (a)(1)(A)(ii) no later than 90 days after such mandatory guidelines take effect, except that any judicial challenge that affects such guidelines should not affect drug-testing programs or plans subject to this paragraph.

"(c) In the case of an agency (or component thereof) other than an agency as defined by subsection (a)(2) or an agency (or component thereof) covered by subsection (b), none of the funds appropriated or made available by this Act, or any other Act, with respect to any fiscal year, shall be available to administer or implement any drug testing pursuant to Executive Order Numbered 12564 [set out as a note under this section], or any subsequent order, unless and until--

"(1) the Secretary of Health and Human Services provides written certification with respect to that agency (or component) in accordance with clauses (i) and (iii) of subsection (a)(1)(A);

"(2) the Secretary of Health and Human Services has submitted a written, detailed analysis with respect to that agency (or component) in accordance with subsection (a)(1)(B); and

"(3) the Director of the Office of Management and Budget has submitted a written, detailed analysis with respect to that agency (or component) in accordance with subsection (a)(1)(C).

"(d) Any Federal employee who is the subject of a drug test under any program or plan shall, upon written request, have access to--

"(1) any records relating to such employee's drug test; and

"(2) any records relating to the results of any relevant certification, review, or revocation-of-certification proceedings, as referred to in subsection

(a)(1)(A)(ii)(III).

"(e) The results of a drug test of a Federal employee may not be disclosed without the prior written consent of such employee, unless the disclosure would be--
"(1) to the employee's medical review official (as defined in the scientific and technical guidelines referred to in subsection (a)(1)(A)(ii);
"(2) to the administrator of any Employee Assistance Program in which the employee is receiving counseling or treatment or is otherwise participating;
"(3) to any supervisory or management official within the employee's agency having authority to take the adverse personnel action against such employee; or
"(4) pursuant to the order of a court of competent jurisdiction where required by the United States Government to defend against any challenge against any adverse personnel action.

"(f) [Terminated, effective May 15, 2000, see Pub.L. 104-66, § 3003, as amended, set out as a note under 31 U.S.C.A. § 1113 and page 151 of House Document No. 103-7. This subsection related to annual reports on drug-testing activities conducted by agencies covered by Executive Order No. 12564 (set out as a note under this section).]

"(g) For purposes of this section, the terms 'agency' and 'Employee Assistance Program' each has the meaning given such term under section 7(b) of Executive Order Numbered 12564 [set out as a note under this section], as in effect on September 15, 1986."